CITISTEEL USA, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

United Steelworkers of America,
AFL–CIO, Intervenor.

No. 93–1702.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 12, 1994.

Decided May 5, 1995.

Rehearing and Suggestion for Rehearing
In Banc Denied July 11, 1995.*

* Sentelle, Circuit Judge, did not participate in this matter.

Kenneth W. Starr, Washington, DC, argued the cause for petitioner. On brief were Kenneth N. Bass, John S. Irving, Jr., and Christopher Landau, Washington, DC.

William Baudler, N.L.R.B., Washington, DC, argued the cause for respondent. On brief were Linda Sher, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Paul J. Spielberg, Deputy Asst. Gen. Counsel, Washington, DC.

Richard J. Brean, Pittsburgh, PA, argued the cause for intervenor.

Before WILLIAMS, HENDERSON and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

KAREN LECRAFT HENDERSON, Circuit Judge:

CitiSteel USA, Inc. (CitiSteel) petitions for review of an order of the National Labor Relations Board (NLRB or Board) concluding that it is a successor employer at a dormant steel mill it acquired and is thus obligated to recognize the United Steelworkers of America (Steelworkers or union) as the collective bargaining representative for the mill's workers. CitiSteel argues that there is no substantial continuity between the old and new ownership because it made significant changes in both the facility and the product and that the workers did not have, and could not have had, a reasonable expectation of rehire at the mill. We agree that the record does not contain substantial evidence to support the Board's determination and grant the petition.

## I. BACKGROUND

■ The successorship analysis is "primarily factual in nature and is based upon the totality of the circumstances of a given situation." *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 43, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987). We accordingly must examine in detail the facts found by the Administrative Law Judge (ALJ) and adopted by the Board. In December 1986, new management of the Phoenix Steel Corporation (Phoenix) announced plans to close its plant in Claymont, Delaware and lay off 220 employees. The melt shop closed on December 13 and "thereafter one department after another closed down, with the employees ... laid off until only a skeleton crew remained to perform maintenance and collect scrap for sale to other steel producers." *CitiSteel USA, Inc.,* 312 N.L.R.B. 815, 817, 1993 WL 394299 (1993). The rolling mill closed (and all production of steel came to an end) on January 23, 1987. In March 1987, Phoenix made its last shipment of steel and laid off its remaining production and maintenance employees.

The workers, who had been represented by the Steelworkers since 1943, expressed "little hope for the future of the Claymont plant." *Id.* at 818, 1993 WL 394299. The president of the union local, Walter Brodzinski, arranged for the Delaware Department of Labor to conduct a series of job search workshops between February and April. Soon afterward, Brodzinski resigned his union position and himself obtained employment outside the state. "Certain employees concluded from [his] exit that he would not have left if there were a reasonable chance that the plant was going to reopen in the near future." *Id.* In March, the Steelworkers' national president placed the Claymont mill local under an administrator and relieved its remaining officers of their duties. The union nonetheless remained active through its national office in efforts to obtain job training and benefits for the workers, represented them in connection with claims

against Phoenix and stayed abreast of the mill's prospects.[1] It also met with possible buyers to discuss potential terms of a collective-bargaining agreement.

Beginning before the closure and throughout 1987, a number of investors approached Phoenix about acquiring the Claymont mill or its assets. Local newspaper articles reporting the negotiations "raised the hopes, if not the expectations, of the jobless" when prospects were good, *id.*, and dashed them with headlines such as "For steel workers, the death blow finally comes," when prospects were bad. Bob Bauers, Wilmington News—J., Nov. 26, 1987, at A19 (*reprinted in* JA 1738). Phoenix's efforts to sell the mill finally appeared successful in December 1987, when Hong Kong investor L.H. Chang of Wai Hing & Company offered to buy it for $13 million and Phoenix accepted. Difficulties arose, however, when it was revealed that Chang's tentative financial backing came from CITIC, an instrumentality of the People's Republic of China. The U.S. Department of Defense, as well as the U.S. Department of Commerce and members of Congress, expressed reservations that sensitive technology might fall into the hands of the Chinese government. Other problems followed when environmental groups and Phoenix's creditors expressed concern over the proposed sale and when Chang was unable to obtain adequate financial support from CITIC. All of the potential obstacles were resolved in early 1988 and the sales agreement was finalized in April. The sale was completed after the Delaware legislature amended the state's Coastal Zone Act to permit CitiSteel to operate the Claymont mill in an otherwise restricted area.

On June 1, 1988 Chang assigned his interest in the Claymont mill to CITIC, which had already formed a new corporation, CitiSteel, to operate the facility. CitiSteel immediately began work on refurbishing and modernizing the plant, continuing into 1989. It spent $25,000,000 on the effort, converting Claymont from a "specialty mill" producing a number of different low-volume, high-cost steels for specific uses to a "minimill" using technologically advanced equipment to mass produce a few types of steel at high volume and low cost. CitiSteel indicated that it planned to begin with about 100 workers and build to a complement of 300 to 350 workers to produce the same amount of steel formerly manufactured by 600 to 1000 people. The plant also required extensive renovation to restore its facilities and equipment to operating condition after two years of inactivity.

The union contacted CitiSteel in September 1988 to demand recognition as the collective bargaining representative for employees of the Claymont mill. CitiSteel was noncommittal and placed recruiting advertisements in newspapers for production and maintenance employees. The union urged former Phoenix employees to apply, asserting that it would represent them if a majority of CitiSteel's new employees consisted of former Phoenix employees. The plant resumed limited production in February 1989, more than two years after Phoenix had stopped manufacturing steel. By April, the plant employed 124 production and maintenance workers, the majority of whom had been employed by Phoenix.

The former Phoenix employees returned to find that CitiSteel had modified the organization of the mill's workers, primarily by reducing the number of job classifications. CitiSteel's chief executive officer testified that the object of the change was "to enrich job content and broaden the responsibility of each job position." 312 N.L.R.B. at 826, 1993 WL 394299. CitiSteel employees now performed several functions, many of which had been covered by a separate job classification at Phoenix.[2] To facilitate the change, CitiSteel provided formal "cross-training" sessions to the employees. It "encouraged each employee with a special skill to learn other skills so that if he were faced with a

---

1. The union did not pay strike benefits to the Claymont mill workers. It took the position that "in contrast to a normal work stoppage, the current Claymont situation involves a plant that is virtually shut down." 312 N.L.R.B. at 818, 1993 WL 394299.

2. The production and maintenance employees at Phoenix were divided into 134 job classifications, which CitiSteel reduced to "around 25." 312 N.L.R.B. at 815, 1993 WL 394299.

problem which is not strictly within the parameters of his expertise, he would be able to solve the problem himself rather than seek the aid of another employee." *Id.* CitiSteel also fused into a single entity the management of the production and maintenance crews, which under Phoenix had been run as separate operations with different priorities. Further, in line with the expansion of the workers' job content at CitiSteel, production workers could now be assigned to maintenance jobs.

The changes also reduced the level of supervision received by the CitiSteel workers. The ALJ noted testimony that "rank and file employees at CitiSteel are performing duties that had been performed by supervisors at Phoenix." *Id.* at 824, 1993 WL 394299. One CitiSteel employee who had worked for Phoenix testified during the administrative proceedings that his CitiSteel job is "a lot more extensive. You have a lot more responsibilities." *Id.* Another worker testified that his Phoenix supervisor "would assign you the job for the night, and then whatever incidental repairs, he would come and tell you ... such and such a thing needs to be fixed, go and get that." *Id.* The same employee said that at CitiSteel "[w]e don't have anybody [supervising]. We've got two electricians on a tour and two mechanics." *Id.* Moreover, the supervisors themselves took on additional tasks. The ALJ found that "whereas at Phoenix, supervisors were generally prohibited from performing unit work, at CitiSteel, there are no such restrictions and supervisors are encouraged to perform any work that will get the job done." *Id.* at 827, 1993 WL 394299.

Shortly after the Steelworkers renewed its demand for recognition in December 1988, CitiSteel responded by letter that CitiSteel was not a successor to Phoenix and that CitiSteel would not recognize the union as the collective bargaining representative of the Claymont workers. In February 1989,

the Steelworkers filed unfair labor practice charges against CitiSteel, charging that CitiSteel had violated sections 8(a)(1), 8(a)(3) and 8(a)(5) of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 158(a)(1), 158(a)(3), 158(a)(5), by refusing to recognize and bargain with it as the representative of the workers. The parties settled most of the charges but could not agree on the successorship issue.

After a hearing, the ALJ issued findings of fact and an order concluding that CitiSteel was a successor employer to Phoenix. The NLRB adopted the ALJ's order in September 1993, found CitiSteel in violation of the NLRA and ordered it to bargain with the Steelworkers. 312 N.L.R.B. at 815–16, 1993 WL 394299. CitiSteel petitions for review and the NLRB cross-petitions for enforcement.

## II.  DISCUSSION

A new employer is a successor if there is "substantial continuity" between the enterprises. *Fall River,* 482 U.S. at 43, 107 S.Ct. at 2236.[3] Substantial continuity exists when the new company has "acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations." *Golden State Bottling Co., Inc. v. NLRB,* 414 U.S. 168, 184, 94 S.Ct. 414, 425, 38 L.Ed.2d 388 (1973). "The essential inquiry is whether operations, as they impinge on union members, remain essentially the same after the transfer of ownership." *International Union of Elec., Radio & Mach. Workers (IUEW) v. NLRB,* 604 F.2d 689, 694 (D.C.Cir.1979). The analysis "is undertaken with an emphasis on the employees' perspective." *Fall River,* 482 U.S. at 43, 107 S.Ct. at 2236; *United Mine Workers (UMW) Local 1329 v. NLRB,* 812 F.2d 741, 744 (D.C.Cir. 1987).[4]

---

3. If a new employer is a successor, the union originally certified as the collective bargaining representative of the employees presumptively retains its certification if a majority of employees after the change of ownership worked for the predecessor employer. *NLRB v. Burns Int'l Sec. Servs., Inc.,* 406 U.S. 272, 279, 92 S.Ct. 1571, 1577, 32 L.Ed.2d 61 (1972).

4. The focus on the employees' perspective stems from the implied statutory goal of promoting "industrial peace." "If the employees find themselves in essentially the same jobs after the employer transition and if their legitimate expectations in continued representation by their union are thwarted, their dissatisfaction may lead to

■ We will uphold the NLRB's successorship determination unless it is not supported by substantial evidence or the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case. *Fall River*, 482 U.S. at 42, 107 S.Ct. at 2235; *International Union of Petroleum & Indus. Workers v. NLRB*, 980 F.2d 774, 778 (D.C.Cir.1992). "Nevertheless, this court is a reviewing court and does not function simply as the Board's enforcement arm. It is our responsibility to examine carefully both the Board's findings and its reasoning...." *Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 42 (D.C.Cir.1980). Recognizing that "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight," *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951), we conclude that the Board's determination not only is not supported by substantial evidence but also disregards significant evidence that CitiSteel is not a successor under the analysis applied by the Supreme Court.

## A. *Substantial Change*

■ To determine whether a "substantial change" has occurred, courts and the Board consider

> whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.

*Fall River*, 482 U.S. at 43, 107 S.Ct. at 2236 (citations omitted). CitiSteel's $25 million infusion (almost twice the $13 million paid for the mill itself) transformed the facility from a specialty steel mill to a "minimill" producing a narrow range of steel products with flexible employee work practices. JA 537 (testimony of Robert Crandall). Contrary to the Board's finding, the evidence indicates that CitiSteel made significant changes to the Claymont mill, as a result of which the former Phoenix employees no longer "are doing the same jobs in the same working conditions under the same supervisors." [5]

As described in the foregoing statement of facts, the record establishes that both the jobs and the working conditions, including the extent of supervision, of the workers are different in CitiSteel's minimill operation. Both CitiSteel management and (more importantly) the former Phoenix workers testified that the CitiSteel jobs provided more responsibilities and were more complex, a point further demonstrated by the additional training conducted by CitiSteel. One former Phoenix employee testified that he quit his CitiSteel job in part because he had to perform more and different tasks than at Phoenix. JA 335. Similarly, the ALJ credited testimony that CitiSteel workers are responsible for duties that supervisors had performed at Phoenix and frequently work unsupervised.[6] 312 N.L.R.B. at 824, 1993 WL 394299. Philip Raczkowski, a former millwright at Phoenix, testified that there is a "substantial difference" between the supervision at CitiSteel and at Phoenix. *Id.* Indeed, on the subject of changes in the work environment at CitiSteel, the *only* employee testimony cited by the ALJ referred to differences, not similarities, between CitiSteel and Phoenix.

The evidence also indicates that CitiSteel's production processes and customer base are distinct from Phoenix's. The dramatic reduction in the workforce necessary to staff the facility as well as the extensive rebuilding of the mill fully support CitiSteel's contention

---

labor unrest." *Fall River*, 482 U.S. at 43–44, 107 S.Ct. at 2236.

**5.** The $25 million capital overhaul, together with the accompanying substantial transformation of operations, distinguish this case from *United Food & Commercial Workers Int'l Union, Local 152 v. NLRB*, 768 F.2d 1463 (D.C.Cir.1985). There, the renovations by the successor company totaled only 10 per cent of the purchase price, *see Spencer Foods, Inc.*, 268 N.L.R.B. 1483, 1484,

1984 WL 36103 (1984), and were found to be "limited improvements and adjustments" that did not change " 'the essential operations of the Spencer plant.' " 768 F.2d at 1474.

**6.** The ALJ noted as an example the testimony of Joseph Marvel that he runs the computer controlling a casting machine, a job that foremen had performed at Phoenix. 312 N.L.R.B. at 824, 1993 WL 394299.

that the transformation to a "minimill" changed the nature of the Claymont facility. In addition, the testimony established that Phoenix treated each order for a specialty steel as a "separate operation" with "constant switching of the operation to meet the requirements of the numerous and varied orders." *Id.* at 823, 1993 WL 394299. By contrast CitiSteel produces no specialty steel products and the ALJ found that only 40 to 45 per cent of Phoenix's former customers are customers of CitiSteel. *Id.* at 823–24, 1993 WL 394299.

Although the NLRB noted the changes made by CitiSteel, it accounted for its contrary determination that "substantial continuity" existed between CitiSteel and Phoenix with only the conclusory statements "[w]e find that the job skills are substantially the same," *id.* at 815, 1993 WL 394299, and "[w]e do not think that the changes substantially altered what the employees would consider to be their essential jobs." *Id.* at 816, 1993 WL 394299. The Board does not reveal how the record supports these propositions, nor does it provide any reasons for discounting the contrary evidence. Similarly, the ALJ's opinion adopted by the Board recognizes the "numerous and thoroughly documented changes instituted by CitiSteel," but discounts them with the simple assertion that "substantial continuity remained intact." *Id.* at 831, 1993 WL 394299. The Board's conclusions are not supported by substantial evidence in light of the overwhelmingly contrary evidence of record noted by the ALJ.[7]

7. The Board stated only

[w]hile we find that this consolidation of function may require employees to perform some additional tasks, each one also continues mainly to perform work he had performed for Phoenix. When employees continue to perform substantially the same work that they did for the predecessor, the addition of some new job duties is not likely to change the employees' attitude toward their job to such an extent that it will defeat a finding of continuity of the enterprise.

312 N.L.R.B. at 815, 1993 WL 394299. The overall record weighs heavily against the Board's conclusion, particularly the workers' testimony that *their* perceptions of their jobs *in fact* changed.

8. The Board and the ALJ both asserted that the hiatus may have been less than two years when viewed from the employees' perspective as a re-

## B. *Interruption*

The Board also failed to consider the hiatus in production between the Phoenix shutdown and CitiSteel's startup and the accompanying negative impact on the workers' expectation of rehire. "[T]he occurrence of a lengthy hiatus may well weigh against the reimposition of bargaining obligations when operations are set to resume. We note that in such circumstances, employees naturally have slim, if any, expectations of recall and their attitudes toward representation may well be affected adversely." *United Food & Commercial Workers Int'l Union, Local 152 v. NLRB,* 768 F.2d 1463, 1472 (D.C.Cir.1985) (citations omitted). The record establishes such an "interruption," further precluding a finding of successorship under the *Golden State Bottling* test.

The gap in production between Phoenix and CitiSteel lasted two years during which the prospects for the reopening of the mill were speculative at best, as evidenced by the ALJ's failure to find that the ongoing negotiations for the sale of the mill or its assets gave rise to any expectations on the part of the Phoenix employees. *Id.* at 829, 1993 WL 394299.[8] The national security concerns arising from the sale to Chang and the need for special legislation to allow the mill to reopen cast doubt on the mill's future even after Chang agreed to buy it. Indeed, the most powerful evidence of the workers' view of the prospects for the mill came from the Steelworkers itself—its decision to close (and later

sult of the union's continuing efforts on their behalf.

Although the Supreme Court implied in *Fall River* that such efforts could reduce the subjective effect of a hiatus on workers when tied to other facts suggesting a reasonable expectation of rehire, *see* 482 U.S. at 45, 107 S.Ct. at 2237, they are not relevant here in light of the ALJ's conclusion that the record did not warrant a finding that the Phoenix workers had any actual expectation of rehire at the Claymont mill before Chang's acquisition of it and the corroborating evidence that the workers themselves saw little chance that the mill would reopen. 312 N.L.R.B. at 818, 829, 1993 WL 394299. The ALJ found instead that reports of Phoenix's efforts to sell the mill gave rise to hopes that were "potential expectations," *id.* at 830, 1993 WL 394299, but we agree with CitiSteel that "potential expectations" are insufficient to affect the successorship analysis.

sell) the union hall and Brodzinski's departure to seek work elsewhere. The union leadership obviously saw dim possibilities at best for the plant's reopening and the rank-and-file workers had nothing other than newspaper stories described by the ALJ as "too factually inadequate to reflect any probabilities" adequate to give rise to any expectations of rehire. *Id.* at 830, 1993 WL 394299.

The Board and the ALJ largely discounted the relevance of the hiatus on the basis of the statement in *Fall River* that a hiatus "is relevant only when there are other indicia of discontinuity." 482 U.S. at 45, 107 S.Ct. at 2237; 312 N.L.R.B. at 816, 1993 WL 394299. As our review of the evidence demonstrating substantial change at the mill makes clear, however, the record contains abundant other indicia of discontinuity to make the impact of the hiatus on the workers' expectation of rehire relevant.

## C. *Conclusion*

We have previously noted that the obligation of a new employer to recognize a union rests on two preconditions: "a majority of the employees must have worked for the predecessor employer, and there must be continuity of operations." *UMW Local 1329,* 812 F.2d at 743. CitiSteel argues that the Board effectively disregarded the second condition and instead imposed an obligation to bargain on the basis of nothing more than the percentage of its workforce previously employed by Phoenix and the fact that it purchased Phoenix's assets. We agree. The record in this case establishes both "interruption" and "substantial change" tilting so strongly against continuity that substantial evidence does not, and cannot, support the Board's determination that CitiSteel is a successor employer to Phoenix.[9]

For the foregoing reasons, we grant CitiSteel's petition for review and deny the Board's cross-petition for enforcement.

*So ordered.*

---

9. Because CitiSteel is not Phoenix's successor we need not address its challenge to the Board's approval of a combined bargaining unit for all of its clerical and technical employees.