**FLAMINGO HILTON–LAUGHLIN, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**United Steelworkers of America, AFL–CIO CLC, Intervenor.**

**No. 97–1467.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 11, 1998.

Decided July 31, 1998.

Joseph E. Herman argued the cause for the petitioner. Richard C. Hotvedt entered an appearance.

Robert J. Englehart, Attorney, National Labor Relations Board, argued the cause for the respondent. Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Frederick C. Havard, Attorney, National Labor Relations Board, were on brief.

Rudolph L. Milasich, Jr. argued the cause for the intervenor.

Before: HENDERSON, ROGERS and GARLAND, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

Separate concurring opinion filed by Judge ROGERS.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Petitioner Flamingo Hilton–Laughlin (Flamingo), a subsidiary of Hilton Gaming Corp., operates a resort hotel and casino in Laughlin, Nevada. On July 29, 1997 the National Labor Relations Board (NLRB, Board) issued a *Gissel* order [1] which directed Flamingo to bargain with the United Steelworkers of America, AFL–CIO CLC, (Union) as the exclusive bargaining representative of two units of Flamingo employees, based on findings that Flamingo had engaged in numerous unfair labor practices during the Union's unsuccessful organization campaign. *Flamingo Hilton–Laughlin,* 324 N.L.R.B. No. 14 (1997). Flamingo petitions for review of the Board's decision on the grounds that (1) the Board failed to adequately justify issuance of a *Gissel* bargaining order; (2) some of the unfair labor practices found by the Board are unsupported by substantial evidence and (3) Flamingo was denied its due process right to a neutral decisionmaker. The NLRB has filed a cross-application for enforcement of its order. For the reasons and to the extent set out below, we grant in part Flamingo's petition for review and deny the NLRB's application for enforcement of

its *Gissel* order and two of its unfair labor practice findings. We nonetheless deny review and grant enforcement of the Board's order with respect to the remaining unfair labor practices included therein.

## I.

In January 1993 the Union began an organizing campaign at Flamingo's hotel and casino, which, with more than 2,000 employees, is the largest of several gaming establishments in Laughlin, Nevada. Flamingo hired a labor relations consulting firm and conducted a vigorous counter-campaign. In March 1993 the Union filed a petition to be certified as representative of a bargaining unit comprising "[a]ll full-time and part-time employees in the departments of Housekeeping/Custodial, Food/Beverage, Slots, Coin Room Hotel Services/Bellmen, Front Desk, Valet, and Cage." Joint Appendix 4. On June 9, 1993 the NLRB issued a "Decision and Direction of Election," which excluded slot machine and coin room employees from the proposed bargaining unit and scheduled an election among the roughly 1,000 remaining unit employees for July 6. During the union campaign the Union had solicited and obtained union authorization cards from a majority of the hotel unit employees and of the excluded slot and coin room employees. In the July 6 election, however, the hotel unit employees rejected union representation by a vote of 495 to 389. On October 28, 1993 the Union filed an unfair labor practice charge with the NLRB and, as a result, on February 25, 1994 the Board's acting regional director filed a complaint and notice of hearing alleging more than seventy unfair labor practices.

A 67-day hearing was conducted over the course of one year and on April 25, 1996 an administrative law judge (ALJ) issued a decision finding Flamingo had committed more than forty of the charged unfair labor practices, in violation of section 8(a)(1) and (3) of the National Labor Relations Act (Act), 29

---

1. A *Gissel* order is one requiring an employer to bargain with a union and is issued "to remedy violations of section 8(a) of the National Labor Relations Act ... if the Board finds, on balance, that the effects of those past practices make a fair election unlikely." *Amazing Stores, Inc. v.* *NLRB,* 887 F.2d 328, 329 (D.C.Cir.1989), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990); *see NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

U.S.C. §§ 158(a)(1) and (3), and ordering Flamingo to bargain with the Union as the representative of both the designated unit and a separate unit made up of slot employees. The ALJ found Flamingo itself violated the Act by providing various benefits to unit employees during the preelection period, including improved health insurance coverage, increased wages, a more responsive grievance procedure, higher gratuities for baggage handlers and a seniority-based scheduling and assignment policy for cocktail servers. The ALJ further found Flamingo had, during the same period, unlawfully instituted a new employment application screening process aimed at weeding out applicants with union connections. In addition to Flamingo's violations, the ALJ found that individual Flamingo supervisors had engaged in various unlawful acts including (1) soliciting complaints from employees (with at least implied promises to resolve them) (2) promoting the Culinary Union, a prominent gaming industry union, over the Union, (3) questioning employees about their views on unionization, (4) distributing anti-Union buttons, (5) discouraging display of pro-Union buttons, (6) warning employees that conditions of employment such as wages, insurance benefits and perquisites (including free parking, food and uniforms) would worsen if the Union won the election, (7) suggesting that pro-Union employees would be "blacklisted" among the other (non-union) casinos in the area and (8) conducting meetings on the eve of the election at which Flamingo's new president, William Sherlock, made an antiUnion video presentation and asked employees for "[a] chance for management to work hand in hand with [employees] and no third party to interfere," *Flamingo*, slip op. at 47.

The ALJ concluded that the unfair labor practices he found made this a "category II" *Gissel* case, that is, one of "the less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes,'" *Flamingo*, slip op. at 62 (quoting *NLRB v. Gissel Pack-*

*ing Co.*, 395 U.S. 575, 613, 614–15, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969)),[2] based on "considerations [that] include 'the number of employees directly affected by the violation, the size of the unit, the extent of dissemination among the work force, and the identity of the perpetrator of the unfair labor practice,'" *id.* at 62 (quoting *FJN Mfg.*, 305 N.L.R.B. 656, 657 (1991)). Specifically, he determined:

(1) "the number of employees directly affected by the unfair labor practices was extensive" in that "[t]he health insurance changes were shown to affect a substantial percentage of the employees, the same was true of hourly pay increases made, and the new complaint resolution procedure had no limit at all about employee eligibility";

(2) the large size of the unit did not weigh against a bargaining order because "the violations blanketed both units and did not allow the notion to be present that many members of the units were simply not aware of the conduct";

(3) "[t]hese first two factors are largely embodied in the third factor, because dissemination of conduct throughout practically the entire work force was both intended and carried out by the employer" through "items such as wage and benefit increases of tangible effect on why employees were attracted to the Union in the first place, and the inhibiting threat of blacklisting as sprung on the entire work force by universally distributed memorandum just before the election"; and

(4) "of great significance to the question, the perpetrator of the major amount of conduct was [director of human resources John] Kosinski himself" and "[i]t is also influential that Sherlock was a key perpetrator."

*Id.* at 62–63. The ALJ also stated: "On a matter separate from 'pervasiveness' of unfair labor practice conduct, a *Gissel* issue is also affected by special considerations such as the applicant screening also devised by Kosinski," which "tainted the bargaining

---

**2.** A "category I" *Gissel* case involves "'outrageous' and 'pervasive' unfair labor practices."

*Gissel*, 395 U.S. at 613, 89 S.Ct. 1918.

units by employment screening in a manner that cannot be reconstructed," asserting that Flamingo "must bear the consequence of this conduct, both as to unknown probabilities yielding a slightly biased work force to the Union's detriment, and to the possibility that conduct this devious invites the presumption it could readily recur." *Id.* at 63. Finally, the ALJ "conclude[d] the possibility of erasing embedded effects of Respondent's unfair labor practices is so slight that, on balance, a bargaining order is warranted for each unit." *Id.*

In its July 29, 1997 decision the NLRB affirmed the ALJ except that it (1) reversed the finding that Sherlock's last minute plea for a "chance" was an unfair labor practice; (2) rejected the ALJ's "discount[ing] the effects of [the] one-on-one type threats, solicitation, or interrogation" and (3) declined to "rely on the judge's analysis to the extent that he imposed a negative connotation on Flamingo's lawful video presentations." *Id.* at 1–2.

## II.

■ Flamingo argues strenuously that the Board failed to justify ordering bargaining as a remedy. We agree.

■ " '[A] bargaining order is ... an "extreme remedy" that must be applied with commensurate care.' " *Skyline Distribs. v. NLRB*, 99 F.3d 403, 410 (D.C.Cir.1996) (quoting *Avecor, Inc. v. NLRB*, 931 F.2d 924, 938–39 (D.C.Cir.1991), *cert. denied,* 502 U.S. 1048, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992)) (alteration in *Skyline* ). In *Charlotte Amphitheater Corp. v. NLRB*, 82 F.3d 1074, 1078 (D.C.Cir.1996), we again explained the circumstances that warrant a category II *Gissel* order:

[W]e have insisted, and we continue to insist, that "[b]efore we will enforce a category II order, we must find that substantial evidence supports three findings," among them the finding that the possibility

of erasing the effects of past practices and of insuring a fair rerun election by the use of traditional remedies is slight and that employee sentiment once expressed in favor of the Union would be better protected by a bargaining order. *Avecor,* 931 F.2d at 934 (quoting *St. Francis Fed'n of Nurses & Health Professionals v. NLRB,* 729 F.2d 844, 854–55 (D.C.Cir.1984)).[3] We have also emphasized that that finding must be supported by a reasoned explanation that will enable the reviewing court to determine from the Board's opinion (1) that it gave due consideration to the employees' section 7 rights, which are, after all, one of the fundamental purposes of the Act, (2) why it concluded that other purposes must override the rights of the employees to choose their bargaining representatives and (3) why other remedies, less destructive of employees' rights, are not adequate. *Peoples Gas Sys., [Inc. v. NLRB,* 629 F.2d 35, 46 (D.C.Cir.1980) ]. *See also Somerset Welding & Steel, Inc. v. NLRB,* 987 F.2d 777, 781 (D.C.Cir.1993) (declining to enforce bargaining order where "no reasoned justification therefor appear[ed] in the Board's order").

82 F.3d at 1078 (footnote added). In this case neither the ALJ nor the Board made a sustainable finding that the circumstances then existing warranted the "extreme remedy" ordered.

■ The "underlying rationale" for issuing a *Gissel* bargaining order is "that the employees' wishes are better gauged by an old card majority than by a new election." *Charlotte Amphitheater Corp.,* 82 F.3d at 1078. Nevertheless, because "[circumstances ... may change during the interval between the occurrence of the employer's unfair labor practices and the Board's disposition of a case]," there is an "obvious danger that a bargaining order that is intended to vindicate the rights of past employees will infringe upon the rights of the current ones to decide whether they wish to be represented by a

---

3. The other two required findings are that (1) "the Union, at some time, must have had majority support within the bargaining unit" and (2) "the employer's unfair labor practices must have had the tendency to undermine majority strength and impede the election process." *Avecor,* 931

F.2d at 934. The ALJ made both of these findings, Flamingo, slip op. at 59, 62–63, and we need not evaluate their evidentiary support now given our remand for reconsideration of the likelihood of a fair rerun election in light of post-election events.

union." *Id.* "Therefore, we have repeatedly instructed the Board to determine the appropriateness of a *Gissel* bargaining order in light of the circumstances existing at the time it is entered." *Id.* (citing *Avecor Inc.,* 931 F.2d at 936–37; *Pedro's, Inc. v. NLRB,* 652 F.2d 1005, 1012 (D.C.Cir.1981); *Peoples Gas Sys., Inc.,* 629 F.2d at 45–46 n. 18; *NLRB v. Ship Shape Maintenance Co.,* 474 F.2d 434, 443 (D.C.Cir.1972)). Yet both the Board and the ALJ ignored substantial and undisputed changes in the hotel's operation and personnel in the years since the election and focused instead on circumstances as they were in early 1993.

In his remedy discussion, the ALJ, contrary to our precedent, flatly announced: "When considering a bargaining order, the law compels a focus on circumstances existing at the time unfair labor practices were committed. Thus late spring 1993 is that focus, when diverse unlawful conduct by Respondent of enduring impact on employees occurred." *Flamingo,* slip op. at 64. Consistently with his pronouncement, the ALJ rested the choice of remedy on his evaluation of the alleged unfair labor practices and their effects during the pre-election period. *See id.* at 62–63. In doing so he expressly discounted three factors the court has found crucial to a *Gissel* inquiry: passage of time since the practices, turnover of unit members and change in management. *See Charlotte Amphitheater Corp.,* 82 F.3d at 1080 (remanding to Board with direction to accept evidence from employer "that the passage of time or a change in circumstances might

mitigate the need for" *Gissel* order); *Avecor, Inc.,* 931 F.2d at 937 ("[W]e hold that before issuing a category II bargaining order, the Board must carefully consider employee turnover."); *Somerset,* 987 F.2d at 780 (finding no adequate justification for *Gissel* order because "the Board did not adequately consider changes in management and employee turnover at the Company since the time of the election"); *Amazing Stores v. NLRB,* 887 F.2d 328, 331 (D.C.Cir.1989) ("[W]here the practices at issue are not especially pervasive or permanent in nature, the Board needs to make more careful determinations respecting the effect of subsequent employee turnover."), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990); *Peoples Gas Sys., Inc. v. NLRB,* 629 F.2d 35, 45–46 n. 18 (D.C.Cir.1980) ("This court has already held that employee turnover, one 'subsequent event,' must be considered in deciding whether a new election or a bargaining order is the proper remedy.") (citing *Ship Shape Maintenance Co., supra*); *Skyline Distribs. v. NLRB,* 99 F.3d 403, 412 (D.C.Cir.1996) (Henderson, J., concurring) ("[T]his court has 'repeatedly instructed the Board to determine the appropriateness of a *Gissel* bargaining order in light of the circumstances existing at the time it is entered' to take account of, *inter alia,* the passage of time, employee turnover and sensitized management.") (citations omitted).[4]

First, regarding the passage of time, the ALJ observed that "a span of time is always present between unfair labor practices that arguably have such lingering effects as to

---

4. Other circuits have also stressed the importance of one or more of these factors. *See, e.g., HarperCollins San Francisco, a Div. of Harper-Collins Publishers, Inc. v. NLRB,* 79 F.3d 1324, 1332 (2d Cir.1996) ("events subsequent to the employer's violations, such as the passage of time and the substantial turnover of employees"); *NLRB v. Cell Agric. Mfg. Co.,* 41 F.3d 389, 398 (8th Cir.1994) (passage of time, employee turnover and management's "voluntary statements of cooperation") (internal citation omitted); *NLRB v. So–Lo Foods,* 985 F.2d 123, 128–29 (4th Cir. 1992) (employee turnover); *NLRB v. LaVerdiere's Enters.,* 933 F.2d 1045, 1054–55 (1st Cir.1991) (passage of time); *Texas Petrochemicals Corp. v. NLRB,* 923 F.2d 398, 405–06 (5th Cir.1991) (passage of time); *M.P.C. Plating, Inc. v. NLRB,* 912 F.2d 883, 888 (6th Cir.1990) (passage of time and employee turnover); *Impact Indus. v. NLRB,*

847 F.2d 379, 383 (7th Cir.1988) (passage of time, employee turnover and change of management); *Piggly Wiggly v. NLRB,* 705 F.2d 1537, 1543 n. 9 (11th Cir.1983) (changes up to time of hearing). *NLRB v. Armcor Indus.,* 535 F.2d 239, 246 (3d Cir.1976) ("present conditions"). *But see NLRB v. Bakers of Paris,* 929 F.2d 1427, 1448 (9th Cir.1991) (passage of time and employee turnover are "irrelevant to the adjudication of enforcement proceedings"); *NLRB v. Wilhow Corp.,* 666 F.2d 1294, 1304 (10th Cir.1981) ("In *NLRB v. Jamaica Towing, Inc.,* 632 F.2d 208, 214 (2nd Cir.1980), the court stated that 'employee turnover and lapse of time may … become major factors in close cases.' Unlike the case that is cited, the § 8(a)(3) violations that Wilhow is guilty of do not make for the type of close case contemplated by the Second Circuit.").

make a second election unfeasible and the point after contested proceedings when a bargaining order is proposed" and, without reference to contrary court decisions, observed all too accurately that "[t]he Board has·termed such passage of time 'regrettable' but 'unavoidable,' and not a sufficient basis to deny a .bargaining order." *Flamingo*, slip op. at 63 (citing *Quality Aluminum Prods.*, 278 N.L.R.B. 338, 340 (1986), *enforced*, *NLRB v. Quality Aluminum Products,.Inc.*, 813. F.2d 795 (6th Cir.), *cert. denied*, 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 51 (1987)). Because, in his view, "[t]he very nature of this litigation would require extensive time because of its complexity," the ALJ stated he "d[id] not believe the time from events in 1993 to the present should affect imposition of a bargaining order." *Flamingo*, slip op. at 63. He made no specific findings regarding the dissipating effect *vel non* of the passage of time on Flamingo's unfair labor practices. The ALJ also summarily. dismissed Flamingo's arguments based on turnover of personnel. Again invoking the Board's authority and ignoring judicial decisions, he stated: "The Board is· also unconvinced that 'management turnover' affects the validity of a bargaining order." *Id.* at 64 (citing *Action Auto Stores*, 298 N.L.R.B. 875 (1990)).[5] Regarding unit members, the ALJ, while acknowledging that turnover had reached "50 percent as of April 1995," nonetheless declared: "Fundamentally the Board considers evidence of such turnover to be irrelevant as concerning factors that govern the issuance of a *Gissel* bargaining order." *Id.* at 64 (citing *Astro Printing Servs.*, 300 N.L.R.B. 1028, 1029 (1990); Waste Management of Utah, 310 N.L.R.B. 883, 883 (1993)).

In its decision, the Board failed to correct the ALJ or to redirect the focus of the inquiry. With no mention of the overwhelming authority from this circuit and others emphasizing the need to consider circumstances at the time of remedy (and not at the time of violation), the Board adopted the ALJ's views of the law and of the facts with little change. Without addressing the passage of time specifically, the Board did "highlight" two post-election circumstances noted by the ALJ, namely that (1) although the employee screening "began during the pre-election period," it "continued for many months after the July 6, 1993· election" and (2) that "corporate Hilton executives," to whom the ALJ referred, "were involved in the Respondent's unlawful campaign against the Union and are· still employed by the Respondent," including Jim Anderson, Hilton's corporate senior vice president of labor relations and personnel administration, who "the record shows . . . played a major role in orchestrating the Respondent's unlawful campaign against the Union" and whose "continued employment is a factor undercutting the Respondent's management turnover defense to the imposition of a bargaining order here." *Flamingo*, slip op. at 1–2. These conclusionary comments do not justify enforcement of a *Gissel* category II bargaining order.

First, the ALJ pointed to only a handful of instances (with little detail) in which the screening process might have influenced employment decisions. *See Flamingo*, slip op. at 24–26. Further, any effect the process might have had on the unit's composition may well have dissipated by the time of the Board's decision given Flamingo's substantial employee turnover—which the Board did not address. Most importantly, it is anything but clear that the process lasted much beyond the election. The ALJ made no finding to this effect and there is scant evidence in the record to support the Board's observation that it did. As for retention of corporate management personnel, while the ALJ found Anderson's role in Flamingo's counter-campaign was substantial, *see, e.g.*, *id.* at 8 ("Anderson primarily developed the overall extent of Respondent's countering campaign."), neither the ALJ nor the Board assessed the *continuing effect* of Anderson's retention in light of employee turnover and changes in on-site management, including the apparent departure of both Sherlock and Ko-

---

5. Flamingo alleges that 14 of the 21 supervisors found to have committed unfair labor practices, including Sherlock and Kosinski, are no longer employees at the hotel. *See* Brief of Appellant at 24–25 & n.4.

sinski.[6] In short the Board's passing nod in the court's (or courts') direction does not meet its burden in a *Gissel* category II case. The Board must—to iterate—find that a bargaining order is necessary *at the time it is issued* and support its finding with a "reasoned explanation that will enable [us] to determine from the Board's opinion (1) that it gave due consideration to the employees' section 7 rights, which are, after all, one of the fundamental purposes of the Act, (2) why it concluded that other purposes must override the rights of the employees to choose their bargaining representatives and (3) why other remedies, less destructive of employees' rights, are not adequate." *Charlotte Amphitheater,* 82 F.3d at 1078 (citations omitted).

### III.

Having concluded that the bargaining remedy cannot stand, we now address Flamingo's substantial evidence and due process arguments.

▄ First, we agree with Flamingo that two of the unfair practice findings must be vacated because not supported by substantial evidence. *See CitiSteel USA, Inc. v. NLRB,* 53 F.3d 350, 354 (D.C.Cir.1995). The ALJ found that the hotel's assistant director of housekeeping, Kent Vaughn, committed an unfair labor practice by threatening employees at a meeting that their pay would be reduced and they would lose benefits if they voted in favor of the Union, based on the translation of his comments at the meeting made by Amanda Vasquez, a bilingual guest room attendant, who acted as interpreter at the meeting. Yet at the same time the ALJ expressly discredited Vasquez's "chronically overstated and unreliable" testimony, finding she had mistranslated Vaughn's actual words, which were to the effect that "loss to employees was an inevitable consequence of their unionizing" and which the ALJ acknowledged were "partisan, but largely permissible." *Flamingo,* slip op. at 42. The

ALJ reasoned that "it was Respondent's choice to designate Vasquez as the interpreter for a substantial assembly of employees" and "[a]s such she became Respondent's agent for this limited purpose, and in the process disseminated threats to the Hispanic employees taking meaning from her as to what two prominent supervisors were presenting." *Id.* "On this special basis," the ALJ concluded, "the allegations must be found to have merit." *Id.* We disagree. In the only supporting authority cited by the ALJ, the Board found an employee-interpreter acted as an agent of the employer expressly because the employee's "activities exceeded those of a mere neutral translator." *Ella Indus.,* 295 N.L.R.B. 976, 976 n. 2 (1989). There is no evidence here that Vasquez, herself a Union supporter, played a comparable role. She was merely enlisted pro hac vice to translate Vaughn's words, apparently because she happened to be both bilingual and present at the meeting. Because there is no evidence that Vaughn (or any other representative of Flamingo's management) committed the unfair labor practices as alleged in paragraph 10(bb) and 10(cc) of the complaint, we cannot sustain the Board's finding that he did.

▄ Nor can we uphold the ALJ's finding that President Sherlock "unlawfully informed employees that it would be futile for them to support the Union." *Flamingo,* slip op. at 48. According to the ALJ, Edgar Galaviz, a fry cook in the chef department, "testified that Sherlock had said the company was not obliged to negotiate with the Union, but that in another sense he could prolong any negotiations for years." *Id.* The ALJ expressly rejected Galaviz's testimony "that Sherlock said that the company was not obliged to negotiate" but accepted as credible the assertion that Sherlock stated "that negotiations could be prolonged for years." *Id.* The ALJ then concluded: "The surviving evidence in support of this allegation is that of [Edgar]

6. The ALJ ascribed to Sherlock and Kosinski much of the responsibility for the unlawful practices, characterizing Sherlock as "a key perpetrator" and Kosinski as "the perpetrator of the major amount of conduct" and "the person most active in advising, planning, and implementing the overall benefit changes." *Flamingo,* slip op. at 62–63. And the Board did not contradict these findings. According to Flamingo, both Sherlock and Kosinski have since left its employ, *see* Brief of Appellant at 24 & 25 n.4, although Kosinski's departure is not noted in the record.

**1174**

Galaviz[, a fry cook in the chef department,] to the effect Respondent foresaw negotiations as lasting for years." *Id.* Sherlock's statement, as the ALJ construed it from the testimony he credited, does not support an unfair labor practice finding. In *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court declared:

> [A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.' He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization.

395 U.S. at 618, 89 S.Ct. 1918 (quoting 29 U.S.C. § 28(c)). The Board itself has expressed the view that "[m]ere references to the possible negative outcomes of unionization ... do not deprive [an employer's campaign] materials of the protections of Section 8(c)." *UARCO, Inc.,* 286 N.L.R.B. 55, 58 (1987), and has, accordingly, found no unfair labor practice in such management statements as "Please, don't let this outside union force you and your Company into a knockdown and drag-out fight!," *id.* at 56–58, and "a vote for the [union] would put us back to the bargaining table which is a long and expensive process, and who knows, we might wind [sic] in another strike," *Coleman Co.,* 203 N.L.R.B. 1056, 1056 (1970). Because Sherlock's statement speculated about the potential duration of the bargaining negotiations based on what he "foresaw," the finding of an unfair labor practice as alleged in paragraph 11(b) of the complaint must be vacated. *See General Elec. Co. v. NLRB,* 117 F.3d 627, 635–36 (D.C.Cir.1997) (in finding unfair labor practice based on employer handbill suggesting likelihood of strike if union won election, "the ALJ erred by converting a possibility into a certainty, then declar-

ing it a violation of the Act"); *cf. Ron Junkert,* 308 N.L.R.B. 1135, 1135 n. 2 (1992) (finding unfair labor practice in employer's "statement that he had only to negotiate with the Union, not sign a contract, and negotiations could last a year" only because "in this context, it was coercive and, indeed, a threat that employee support for the Union would be futile"); *Atlas Microfilming,* 267 N.L.R.B. 682, 685–86 (1983) (finding statement "[S]ure you can go to the government, you can win the election, you bargain one year, two years, three years, we're not going to agree to anything" was "nothing less than a warning that the employees' efforts to organize and select a collective-bargaining representative was an exercise in futility").

■ Finally, we address Flamingo's due process argument and join other circuits in holding that the Board's authority under the Act to seek preliminary injunctive relief against an employer in the district court does not deprive the employer of a neutral decisionmaker in subsequent proceedings before the Board. *See Kessel Food Mkts., Inc. v. NLRB,* 868 F.2d 881, 887–88 (6th Cir.), *cert. denied,* 493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 43 (1989); *NLRB v. Sanford Home for Adults,* 669 F.2d 35, 37 (2d Cir.1981); *cf. Blinder, Robinson & Co. v. SEC,* 837 F.2d 1099, 1104–07 (D.C.Cir.1988) (SEC's authority to seek injunction in district court and to later impose administrative penalty does not violate due process), *cert. denied,* 488 U.S. 869, 109 S.Ct. 177, 102 L.Ed.2d 146 (1988). Like the Sixth Circuit, we find dispositive the Supreme Court's holding in *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), that the combination of investigative and adjudicative functions does not, without more, constitute a violation of due process. *See Kessel Food Mkts.,* 868 F.2d at 887–88. Nor do we perceive any separation of powers defect in the Act's scheme. *See Blinder,* 837 F.2d at 1103–04.

## IV.

For the preceding reasons we grant Flamingo's petition for review and deny the Board's cross-application for enforcement of the Board's order insofar as it (1) finds unfair

labor practices as described in paragraphs 10(bb), 10(cc) and 11(b) of the NLRB complaint and (2) orders Flamingo to bargain with the Union. We grant the Board's cross-application for enforcement of its order with respect to the other unfair labor practices found to have been committed. We further remand for the NLRB to reconsider the appropriate remedy, in accordance with our precedent, and to issue a bargaining order only if it makes a finding that in light of circumstances *at the time of the order,* taking into account the passage of time, turnover of unit members and change in management, "the possibility of erasing the effects of past practices and of insuring a fair rerun election by the use of traditional remedies is slight and that employee sentiment once expressed in favor of the Union would be better protected by a bargaining order." *Charlotte Amphitheater Corp. v. NLRB,* 82 F.3d at 1078 (citations omitted).

*So ordered.*

ROGERS, Circuit Judge, concurring:

Although I agree that the Board has failed to explain adequately its imposition of a *Gissel* bargaining order, the record demonstrates that the Board made sufficient findings regarding management turnover at the hotel. While the ALJ first suggested that "management turnover," in general, should not "affect[ ] the validity of a bargaining order," he proceeded to address this factor and found the hotel's evidence unconvincing. The Board, in turn, adopted these findings regarding management turnover and clarified the underlying reasoning sufficiently. Thus, in my view, the principal issue requiring further consideration on remand is the evidence of substantial employee turnover at Flamingo since the election.

Both the Board and the ALJ considered the hotel's evidence of management turnover and offered particularized explanations why this evidence does not make a bargaining order an inappropriate remedy. At the hearing before the ALJ, the hotel introduced evidence showing that eight of the twenty-one supervisors found to have committed unfair labor practices were no longer employed by the hotel.[1] With the exception of William J. Sherlock, the hotel's President, the ALJ discounted the significance of these departures because the supervisors' unlawful conduct was "minor in nature" or had only a minimal impact on employees in comparison to the substantial number of other unfair labor practices committed by hotel management. Additionally, the ALJ explained that "the mere fact that Sherlock is now gone has lessened effect when it is known that basic labor relations policies are devised by corporate Hilton executives and not necessarily the property president at some given point in time."

In order to clarify this assessment, the Board pointed to Jim Anderson, Hilton's Corporate Senior Vice President for Labor Relations and Personnel Administration, as one of the remaining corporate executives who "played a major role in orchestrating the [hotel's] unlawful campaign against the Union." Anderson "primarily developed the overall extent of [the hotel's] countering campaign" against the Union organization drive, was one of the "select group" that helped choose the labor relations consulting firm hired to combat the union, and directed the on-site managers implementing the campaign. Although Anderson was not personally involved in the majority of unfair labor practices committed by on-site supervisors, he directly participated in some of the hotel's more pervasive unlawful conduct. He was involved, for example, in the hotel's decision

1. Before rendering his decision, the ALJ denied a motion by the hotel to reopen the record to admit evidence that three additional supervisors, including William J. Sherlock, the President of the hotel throughout the election period, had left its employ. The hotel has not raised any substantial challenge to this decision in its petition for review, and the court can only consider the evidence contained in the record. *See* 29 U.S.C. § 160(e),(f) (1994); *Glomac Plastics, Inc. v.*

*NLRB,* 592 F.2d 94, 100 (2d Cir.1979). Nevertheless, the ALJ did consider the effect of Sherlock's departure on the need for a bargaining order, and therefore the court can consider this evidence in reviewing the Board's order. *See Charlotte Amphitheater Corp. v. NLRB,* 82 F.3d 1074, 1080 (D.C.Cir.1996) (citing *Conair Corp. v. NLRB,* 721 F.2d 1355, 1388–89 n. 1 (D.C.Cir. 1983) (Wald, J., dissenting)).

to improve employee health benefits prior to the election and was responsible for determining the timing of the announcement. He also approved an increase in wages for hourly employees, which affected more than half of the employees in the hotel department. In the ALJ's words: "Anderson was delegated the responsibility to determine its timing, and knowing well how it might interplay with the Union's campaign he directed it to be implemented immediately." *Cf. Electrical Prods. Div. of Midland–Ross Corp. v. NLRB,* 617 F.2d 977, 987 (3d Cir.1980).

Regardless of the extent of Anderson's personal complicity in the hotel's unlawful attempts to influence the election, the Board used his conduct to illustrate its general view that responsibility for the hotel's actions reached higher levels of Hilton's corporate management. Anderson and other Hilton executives set the basic labor policies for Hilton's various casino-hotels and specifically approved some of the actions taken by the hotel's supervisors. Thus, the Board concluded that turnover in on-site management is unlikely to improve the chances for a fair rerun election as long as Hilton corporate policy remains unchanged and guided by executives such as Anderson. *See NLRB v. Berger Transfer & Storage Co.,* 678 F.2d 679, 694 (7th Cir.1982); *NLRB v. Anchorage Times Publ'g Co.,* 637 F.2d 1359, 1370 (9th Cir.1981).

This conclusion is bolstered by the Board's experience in other cases involving similar unlawful attempts by Hilton to interfere with union elections at its Nevada hotel-casinos. *See, e.g., Reno Hilton Resorts,* 320 NLRB 197, 197–98 (1995); *Reno Hilton Resorts Corp.,* 319 NLRB 1154, 1154, 1165–66 (1995); *Flamingo Hilton Reno,* 317 NLRB 361, 361 (1995), *aff'd mem,* 95 F.3d 1157 (9th Cir. 1996); *Hilton Hotels Corp.,* 282 NLRB 819, 819, 821–22 (1987). For example, in one of these cases, the ALJ noted:

Hilton does not want to deal with any more unions at the Reno Hilton, or any other of its Nevada properties [including the Flamingo Hilton–Laughlin]. All agree that once [the Reno Hilton] learned of the union organizing activities, it decided at the highest corporate levels to oppose the Union and to involve all or most of its midlevel and high executives in resisting the Union's efforts.

*Reno Hilton Resorts Corp.,* 319 NLRB at 1164; *see also id.* at 1164 n. 6; *Hilton Hotels Corp.,* 282 NLRB at 821 (emphasizing evidence that the entertainment director for all of the Nevada properties was under "corporate instructions to fight" a unionization drive at the Reno Hilton). Indeed, in the past, management at Flamingo has even unlawfully refused to bargain with a union after it was elected and certified as the representative of a different bargaining unit at the hotel. *See Flamingo Hilton–Laughlin, Inc.,* 306 NLRB No. 186, 140 L.R.R.M. (BNA) 1117 (Mar. 31, 1992), *enforced,* 19 F.3d 28 (9th Cir.1994).

In sum, the Board has clearly articulated the reasons why it concluded that the departure of several on-site supervisors has not substantially increased the possibility of a fair rerun election. In particular, contrary to the court's suggestion, *see* opinion at 11, the Board has already addressed the significance of Sherlock's resignation. Moreover, the Board cannot be faulted for failing to consider John Kosinski's departure because the record contains no evidence of this development.[2] The court must defer to the Board's "expert estimate as to the [continuing] effects on the election process of unfair labor practices," *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); *accord Davis Supermarkets, Inc. v. NLRB,* 2 F.3d 1162, 1175–76 (D.C.Cir. 1993), so long as it has provided a reasoned explanation of its conclusions based upon substantial evidence in the record, *see Ave-*

---

**2.** In its briefs, the hotel asserts that Kosinski has left its employ, without specifying the date of his departure or offering any evidentiary support. From the record it is clear that Kosinski was still employed by the hotel throughout the course of the hearings before the ALJ. The Board also appeared to have no knowledge of his departure at the time it issued the bargaining order. There is no indication that the hotel ever alerted the Board to this factual development, and the Board had no obligation to inquire into Kosinski's status. *See Charlotte Amphitheater Corp.,* 82 F.3d at 1080.

*cor, Inc. v. NLRB,* 931 F.2d 924, 937–38 (D.C.Cir.1991).

I otherwise concur in the court's opinion. The Board has not adequately explained why employee turnover had not ameliorated the effects of the hotel's unfair labor practices to such an extent that a *Gissel* order was unnecessary. The Board dismissed the effects of employee turnover within the bargaining units primarily because the hotel's "unlawful screening of job applicants ... continued for many months after the July 6, 1993 election." While the Board might well determine that an employer's screening process, if used to alter natural employee turnover in order to disfavor the union in future elections, might leave "so lasting an imprint that a fair rerun election cannot be assured," *id.* at 937, as the court makes clear, *see* opinion at 1172–1173, the Board's assertion in this regard is not supported by the record. The ALJ only found that the hotel had screened out pro-Union applicants in the months directly preceding the election, and little evidence supports the conclusion that the screening continued afterwards. On remand the Board must "carefully consider employee turnover" and determine whether "changes in the [hotel's] work force have made a bargaining order now inappropriate, even if one might have been appropriate at some earlier time." *Id.* (quoting *NLRB v. Pace Oldsmobile, Inc.,* 681 F.2d 99, 102 (2d Cir.1982) (per curiam)) (internal quotation marks omitted).

Although its finding that the hotel continued to screen out Union-leaning applicants after the election cannot be maintained, at least not without further explanation of the evidence and inferences on which it relies, the Board should consider on remand the fact that the hotel has not changed its hiring procedures and, thus, the potential for abuse remains. Prior to the election, the hotel modified its hiring practices by requiring a second approval step for job applicants. This additional level of review was used by supervisors in the hotel's human resources department to disqualify applicants who had "friends or relatives working in the casino

that were affiliated with the union." Because this unlawful screening was carried out personally by one or two supervisors, it remained undetected until well into the course of the hearings before the ALJ. Although there is no evidence that the hotel's human resources department is still using this second round of approval to dilute Union support, the procedure remains in effect. The ALJ noted that given the hotel's "deep commitment" to resisting the unionization of its employees, "conduct this devious invites the presumption [that further tainting] could readily recur." Somewhat undercutting this presumption, however, are the apparent facts that the supervisor responsible for devising and implementing the applicant screening, John Kosinski, is no longer employed by the hotel[3] and that the responsibility for conducting the second approval step is now divided among several different members of the human resources department. These are considerations for the Board on remand.

Furthermore, aside from the issue of applicant screening, there may exist other reasons why substantial employee turnover within the bargaining units may have failed to dissipate the effects of Flamingo's unfair labor practices. After cursorily dismissing the evidence of employee turnover as "irrelevant," the ALJ remarked:

> [T]here are several hundred employees remaining in the two units who experienced the influencing unfair labor practices. The facility never closes, and a more than ordinary potential is present for continuing and cross communication among new and longer service employees as well as conversation spanning departmental lines about many happenings of the Union's long campaign.

This somewhat speculative conclusion does not, by itself, provide sufficient explanation for the imposition of the bargaining order. Cf. *Be–Lo Stores v. NLRB,* 126 F.3d 268, 283 (4th Cir.1997). The ALJ pointed to no evidence in the record that "cross-communication" had actually occurred but rather offered general assumptions that could equally

---

**3.** Although evidence of Kosinski's departure is not contained in the record, *see supra* note 2, on remand, the hotel may, of course, petition the

Board to reopen the record to admit such evidence. *See* 29 C.F.R. § 102.48(b) (1998).

## 1178

apply to many other employers. Perhaps realizing the inadequacy of these statements, the Board did not comment on them and instead chose to emphasize the hotel's continued applicant screening as a factor undercutting the effects of substantial employee turnover. Nevertheless, on remand, the Board should reevaluate the ALJ's findings and consider any evidence showing that knowledge of the hotel's unfair labor practices continues to disseminate throughout the workforce. Laughlin, Nevada, is a relatively small population center whose chief industry consists of several large casino hotels, including the Flamingo. New employees, who have likely worked at other area casinos, may already know of the labor difficulties at the hotel and management's determination to prevent unionization. But without specific findings by the Board supported by evidence in the record, such factors remain purely speculative and a bargaining order cannot issue. *See Avecor, Inc.*, 931 F.2d at 938.

Finally, while the passage of time, in and of itself, should not be dispositive, *see St. Francis Fed'n of Nurses & Health Prof'ls v. NLRB*, 729 F.2d 844, 856 (D.C.Cir.1984); *Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35,

47–48 (D.C.Cir.1980), it may increase the chances of a fair rerun election when combined with other changes in the bargaining unit, such as employee turnover. *See J.L.M., Inc. v. NLRB*, 31 F.3d 79, 84 (2d Cir.1994). Over five years have now elapsed since the tainted representation election. In its initial decision, the Board adopted the ALJ's finding that the three-year lapse between the election and his order was representative of the normal course of litigation and particularly unavoidable due to the complexity of the instant case. Regardless of the adequacy of the Board's reasoning, on remand the Board must readdress whether the intervening years, in conjunction with the changed circumstances, have helped to dissipate the remaining effects of Flamingo's unfair labor practices. *See Charlotte Amphitheater Corp.*, 82 F.3d at 1078; *Avecor, Inc.*, 931 F.2d at 937.