**PENNSYLVANIA TRANSFORMER TECHNOLOGY, INC.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**United Steelworkers of America,**
Intervenor.

**No. 00–1388.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 17, 2001.

Decided June 29, 2001.

Clare M. Gallagher argued the cause for the petitioner. Patrick L. Abramowich and Brian Seth Roman were on brief for the petitioner.

Eric D. Duryea, Attorney, National Labor Relations Board, argued the cause for the respondent. Leonard R. Page, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Charles P. Donnelly, Attorney, National Labor Relations Board, were on brief.

David R. Jury argued the cause for the intervenor. David I. Goldman entered an appearance.

Before: HENDERSON, TATEL and GARLAND, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

The petitioner, Pennsylvania Transformer Technology, Inc. (PTTI), petitions the court for review of a decision and order of respondent National Labor Relations Board (NLRB or Board), reported at 331 N.L.R.B. No. 151 (Aug. 25, 2000). In that decision, the Board affirmed and adopted, with modifications, the decision of the Administrative Law Judge (ALJ), who held

that PTTI violated section 8(a)(1) and 8(a)(5) of the National Labor Relations Act (NLRA or Act), 29 U.S.C. § 158(a)(1) & (5), by refusing to recognize the United Steel Workers of America, AFL–CIO (Union) as the collective-bargaining representative of PTTI's production and maintenance employees pursuant to a recognition request made on March 30, 1998. PTTI maintains that the Board erred in determining that it was a successor to Cooper Industries, Inc. (Cooper) and that it had hired a substantial and representative complement of employees as of April 1, 1998. The Board cross-applies for enforcement. For the reasons set forth below, we deny PTTI's petition for review and grant the Board's application for enforcement.

## I. Background

Beginning in 1985, Cooper owned and operated a plant in Canonsburg, Pennsylvania where it produced core electric transformers and shell form transformers. Cooper also sold spare parts to customers. In 1994 Cooper employed between 750 and 880 employees. Its employees were represented by different locals of the Union in three separate collective-bargaining units. In April 1994 Cooper announced to the Union that it planned to close the facility unless a purchaser could be found by the end of 1994. Although the Union and its three locals formed a committee to find a buyer, none was found and on November 22, 1994 the plant closed. Cooper and the Union entered into a "closing agreement" that provided for recognition of the Union in the event Cooper reopened within two years. Cooper retained a skeleton crew to maintain the facility and to provide spare parts to its utility customers. Several former union presidents, state and local officials and members of the local Chamber of Commerce formed a new search committee to find a buyer. Ultimately the committee

helped to bring about the sale of the plant to Ravindra Nahl Rahangdale.

In 1995 Rahangdale began negotiations to acquire Cooper's plant and equipment. On August 9, 1996 he acquired all of the assets of the Canonsburg plant, which he combined with another company he owned to form PTTI. PTTI commenced operations in August 1996 and hired its first employees on September 1, 1996. In January 1997 the company produced its first transformers, utilizing about one-half of the plant space previously used by Cooper and most of the same equipment. PTTI obtained its employees from Bedway Temporary Services (Bedway), which had also assisted Cooper with staffing. Applicants for employment were interviewed by PTTI personnel but hired by Bedway. Employees worked under the supervision of PTTI as probationary employees for three to six months, at which time they were eligible to become permanent employees of PTTI.

In a letter dated March 30, 1998, the Union requested PTTI to recognize and bargain with it as the exclusive bargaining representative of the company's employee units. As of that time, approximately 82 production employees worked at the plant, 58 of whom, or 72 per cent, were former Cooper employees. Of the 68 production workers on the company's payroll, 54 were former Cooper employees. PTTI refused to recognize the Union, prompting the Union to file an unfair labor practice charge. The Board subsequently issued a complaint alleging that, beginning April 1, 1998, PTTI had unlawfully refused to recognize and bargain with the Union in violation of sections 8(a)(1) and 8(a)(5) of the Act. By the time of the hearing, which was held on July 7, 1998, PTTI had hired approximately 100 production and maintenance employees, a majority of whom were former Cooper employees.

On September 30, 1998 the ALJ issued his findings of fact and conclusions of law, finding, in pertinent part, that PTTI was a successor employer under the Act. The ALJ ordered PTTI to recognize the Union, to bargain collectively with the Union and to post an appropriate notice. PTTI filed timely exceptions to the ALJ's decision. On December 10, 1998 PTTI also filed a motion to reopen the record to introduce evidence that it had 130 production and maintenance employees, only 62 of whom were former Cooper employees and that former members of the Cooper production and maintenance unit became a minority of PTTI's production workers as of October 29, 1998. JA 409. The Board's General Counsel filed limited cross exceptions challenging the ALJ's failure to find specifically that as of April 1, 1998 PTTI had hired a substantial and representative complement of employees. The Board denied PTTI's exceptions and its motion to reopen the record, adopted the ALJ's findings, rulings and order with slight modifications and corrections and granted the General Counsel's cross-exceptions. · The Board held that (1) PTTI was a successor to Cooper, (2) PTTI had hired a substantial and representative complement of employees as of April 1, 1998 and (3) PTTI violated the Act by refusing to recognize and bargain with the Union. PTTI challenges all three determinations.

## II. Analysis

 A new employer is a successor to a former employer if there is "substantial continuity" between the enterprises. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). "Substantial continuity exists when the new company has 'acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations.'" *CitiSteel USA, Inc. v. NLRB*, 53 F.3d 350, 353 (D.C.Cir.1995) (quoting *Golden State Bottling Co., Inc. v. NLRB*, 414 U.S. 168, 184, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973)). "The essential inquiry is whether operations, as they impinge on union members, remain essentially the same after the transfer of ownership." *International Union of Elec., Radio & Mach. Workers (IUEW) v. NLRB*, 604 F.2d 689, 694 (D.C.Cir.1979). The analysis is undertaken with an "emphasis on the employees' perspective." *Fall River*, 482 U.S. at 43, 107 S.Ct. 2225. The implied statutory goal is to promote "industrial peace." "If the employees find themselves in essentially the same jobs after the employer transition and if their legitimate expectations in continued representation by their union are thwarted, their dissatisfaction may lead to labor unrest." *Id.* at 43–44, 107 S.Ct. 2225. Thus the union certified as the collective bargaining representative of the predecessor employer's employees presumptively retains its certification if the majority of employees after the change of ownership worked for the predecessor employer. *See NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 279, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).

 We will uphold the Board's "successorship determination unless it is not supported by substantial evidence or the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *CitiSteel*, 53 F.3d at 354. To determine whether a "substantial continuity" exists, courts and the Board consider

whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has 'the same production process, produces the same products, and basically has the same body of customers.

*Fall River,* 482 U.S. at 43, 107 S.Ct. 2225 (citations omitted). While the Board does not afford controlling weight to any single factor, "[t]he ultimate question is this: Will the employees 'understandably view their job situations as essentially unaltered?'" *Harter Tomato Prods. Co. v. NLRB,* 133 F.3d 934, 937 (D.C.Cir.1998) (quotation omitted).

When a new employer is a successor, it has an obligation to bargain with the certified union so long as "the majority of its employees were employed by its predecessor." *Fall River,* 482 U.S. at 41, 107 S.Ct. 2225. The Board has adopted the "substantial and representative complement" rule for fixing the moment that the determination as to the composition of the successor's work force is to be made. *Id.* at 47, 107 S.Ct. 2225. In deciding when a "substantial and representative complement" exists after a change in employers, the Board examines a number of factors:

> It studies "whether the job classifications designated for the operation were filled or substantially filled and whether the operation was in normal or substantially normal production." *See Premium Foods, Inc. v. NLRB,* 709 F.2d 623, 628 (9th Cir.1983). In addition, it takes into consideration "the size of the complement on that date and the time expected to elapse before a substantially larger complement would be at work ... as well as the relative certainty of the employer's expected expansion." *Id.*

*Fall River,* 482 U.S. at 49, 107 S.Ct. 2225; *see Sullivan Indus. v. NLRB,* 957 F.2d 890, 896 (D.C.Cir.1992) (separating out five factors set forth in *Fall River*).

PTTI complains that the Board erred in determining that it was a successor to Cooper and in fixing the date of April 1, 1998 as the moment at which it had hired a "substantial and representative comple-ment" of employees. It alleges numerous factual discrepancies in the Board's findings and charges that the Board failed to consider evidence that would have led it to reach a different result. We now examine these claims.

Successorship analysis is "primarily factual in nature and is based upon the totality of the circumstances of a given situation." *Fall River,* 482 U.S. at 43, 107 S.Ct. 2225. Accordingly, we "must examine in detail the facts found by the Administrative Law Judge (ALJ) and adopted by the Board." *CitiSteel,* 53 F.3d at 351. Applying the successorship factors enunciated in *Fall River,* we conclude that substantial evidence supports the Board's determination that PTTI was a successor to Cooper. First, the business of both employers is essentially the same. In August 1996 PTTI purchased all of Cooper's facilities and assets used in the manufacture of electrical transformers and began production using most of the equipment in January 1997. Although PTTI's workforce is much smaller than Cooper's, it is in the same line of business (transformer production). Like Cooper, PTTI also supplies spare parts for its customers. *See Pennsylvania Transformer Tech., Inc.,* 331 N.L.R.B. No. 151, slip op. at 3 (filed Aug. 25, 2000).

Second, although working conditions are somewhat different at PTTI—significantly fewer job classifications and increased employee responsibility and flexibility—employees continue to do the same work. They use the same skills and expertise they used at Cooper and use the same process and equipment, often under the same supervisors (although there are fewer supervisors). Significantly, PTTI did not train workers but instead relied on the experienced workforce left by Cooper. *Id.* at 4.

Third, PTTI has a similar production process, produces similar products and retains many of the same customers. Although PTTI uses only 45 per cent of Cooper's floor space and although it sold or removed two ovens, two winding machines and one or two drill presses used by Cooper, it uses the same transformer production process to make transformers. *Id.* at 4. It made few improvements to the physical plant, which nowhere near approached the $25 million spent by the alleged successor in *CitiSteel* (a case on which PTTI relies) to refurbish and modernize the CitiSteel plant, transforming it from a steel mill to a "minimill." 53 F.3d at 352. While at the time of the hearing PTTI had not yet begun production of shell transformers and had produced few large core transformers (the bread and butter of Cooper's production), PTTI affirmed that it planned to aggressively pursue both product lines. And although PTTI did not acquire Cooper's customer or vendor lists, a majority of PTTI's customers are former Cooper patrons. *See Pennsylvania Transformer Tech., Inc.,* 331 N.L.R.B. No. 151, slip op. at 4. As the Board found, the company "[had] filled a vacuum in a market left by Cooper and [was] in the process of rapidly expanding in the manufacture and sale of the same products." *Id.* at 1.

▇▇▇▇▇ Most of the differences noted by PTTI—differences in size, facilities, work force, managerial philosophy, cus-

tomer base—were rejected by this court in *Harter,* which decision explained that "[p]ointing to differences. in size, wages, benefits, training, customer base, managerial philosophy, and supplier contracts, among others, ... is unresponsive to the question we face. We ask not whether [the petitioner's] view of the facts supports its version of what happened, but rather whether the Board's interpretation of the facts is 'reasonably defensible.'" 133 F.3d at 938 (quotation & citation omitted). Although the differences PTTI points to may support its view on successorship, we conclude that substantial evidence supports the Board's successorship determination. We arrive at this conclusion notwithstanding the two-year hiatus between the time Cooper ceased manufacturing transformers and PTTI began production.[1] A hiatus in operations is "relevant only when there are other indicia of discontinuity." *Fall River,* 482 U.S. at 45, 107 S.Ct. 2225; *see United Food & Commercial Workers Int'l Union (UFCW) v. NLRB,* 768 F.2d 1463, 1472 (D.C.Cir.1985). In *CitiSteel* we found "abundant other indicia of discontinuity to make the impact of the hiatus on the workers' expectation of rehire relevant." 53 F.3d at 356. We do not find such abundant indicia here.[2] Unlike in *CitiSteel,* there were no "significant changes" to the facility and, although PTTI's production process and customer bases have differences, they are not as significant as the total reformation (*e.g.*, extensive plant renovation, formal job training, changed pro-

---

1. During the hiatus, however, a skeleton crew made the necessary repairs and supplied parts to former customers. *Id.* at 4.

2. The facts here are more similar to those in *UFCW* than those in *CitiSteel*. In *UFCW*, there was an eighteen-month hiatus after which the successor employer invested $1.3 million in capital improvements, purged most of the former upper management, made changes to the production process, attracted new customers and lost others, contracted with new suppliers, and down-sized its operation, using only

a portion of the former facility. Nonetheless we held that the new employer was a successor because "[t]he focus of the analysis ... is not on the continuity of the business structure in general, but rather on the particular operations of the business as they affect the members of the relevant bargaining unit." *UFCW,* 768 F.2d at 1470. There, employees used the same skills and worked under essentially the same conditions. *Id.* at 1474. We reach the same conclusion here.

duction process and new customer base) that occurred in *CitiSteel*. Most importantly, unlike the union in *CitiSteel*, which closed its union hall and foresaw "dim possibilities at best for the plant's reopening," *id.* at 355–56, here the union actively participated in finding a purchaser to reopen the facility.[3] Based on all the evidence, we conclude that the Board reasonably determined that, despite the lengthy hiatus, employees had "legitimate expectations in continued representation by their union." *Fall River*, 482 U.S. at 43, 107 S.Ct. 2225.

Having concluded that substantial evidence supports the Board's successorship determination, we now review the Board's application of the "substantial and representative complement" rule. Substantial evidence also supports the Board's finding that PTTI had hired a substantial and representative complement of employees as of April 1, 1998. PTTI had hired workers for both of its job classifications— transformer technician and apprentice—as of the date of the recognition demand. *See Pennsylvania Transformer Tech., Inc.*, 331 N.L.R.B. No. 151, slip op. at 2. PTTI had also begun "substantially normal production" as of April 1, 1998. It had produced its first transformer in late April 1997 and between August 1997 and June 1998 PTTI's monthly sales figures showed signs of relative stability. JA 382. Although PTTI predicted significant growth between 1999 and 2001,[4] the August 1997–

June 1998 sales figures indicate that the size of workforce was sufficiently large to enable the company to begin normal production of electric transformers. As the court acknowledged in *Fall River* in rejecting a "full" complement standard, the expansionist dreams of many entrepreneurs necessitate that the court fix the moment in time when a business has begun its normal production. 482 U.S. at 51, 107 S.Ct. 2225. Accordingly, we affirm the Board's finding that PTTI had hired a substantial and representational complement of employees by April 1, 1998. Because as of that date a majority of PTTI's employees were former Cooper employees, PTTI had an obligation to recognize the Union as the collective bargaining representative of its employees. By not doing so, it violated section 8(a)(1) and (a)(5) of the NLRA.

### III. Conclusion

In sum, substantial evidence supports the Board's determination that PTTI was a successor to Cooper and that PTTI had hired a substantial and representational complement of employees by April 1, 1998. Accordingly, we deny PTTI's petition for review and grant the Board's cross-petition for enforcement.

*So ordered.*

---

3. PTTI points to a Union press release urging its members to seek other employment or remain in school while the Union continued its efforts to find a purchaser for the plant. While the press release shed light on whether the Union thought the plant would reopen, it also recognized the Union's efforts to recruit prospective purchasers, lobby representatives of the Commonwealth of Pennsylvania for assistance, persuade Cooper to sell the facility to a purchaser that would resume operations, assist PTTI in obtaining financing and encourage its members to apply for employment

while at the same time it kept the community and news media informed about its campaign. *See* JA 24–33, 376–79.

4. PTTI refers to non-record material throughout the portion of it brief, *see, e.g.,* Pet. Br. 15 & n.4, 16–18, yet it did not challenge the Board's denial of its motion to reopen the record. We also deny PTTI's motion to supplement the record with a Union pamphlet; assuming arguendo its materiality, PTTI failed to adduce the evidence before the Board.