# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 3, 2008        Decided January 9, 2009

No. 07-1262

DEAN TRANSPORTATION, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

GRAND RAPIDS EDUCATIONAL SUPPORT PERSONNEL
ASSOCIATION, MEA/NEA,
INTERVENOR

———

Consolidated with 07-1313, 07-1314

———

On Petition for Review, Cross-Application for Enforcement,
and Application for Enforcement
of an Order of the National Labor Relations Board

———

*David E. Khorey* argued the cause for petitioner. With him on the briefs was *Kurt M. Graham.*

*Michael L. Fayette* filed the brief on behalf of Dean Transportation Employees Union, incorporating by reference the brief of petitioner Dean Transportation, Inc.

*Thomas Goldstein* and *Patrick J. Wright* were on the brief for *amici curiae* Kent Intermediate School District, et al. in support of petitioner.

*Heather S. Beard*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Meredith L. Jason*, Supervisory Attorney.

*Fillipe Iorio* argued the cause and filed the brief for intervenor Grand Rapids Educational Support Personnel Association.

Before: HENDERSON and GARLAND, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: When petitioner Dean Transportation, Inc. took over operations at a facility that provided bus transportation for the Grand Rapids Public Schools (GRPS), it refused to recognize and bargain with the Grand Rapids Educational Support Personnel Association (GRESPA), the union that had been representing employees at the facility. Instead, Dean recognized the union that represented bus drivers at Dean's seven other facilities, the Dean Transportation Employees Union (DTEU). The National Labor Relations Board determined that, in so doing, Dean and DTEU violated the National Labor Relations Act. The Board's determination was based on the following findings: Dean was a successor to GRPS as the employer of bus drivers, mechanics, and route planners at the facility it acquired by lease from GRPS; a unit consisting of those employees was an appropriate bargaining unit; the bus drivers in the unit were not accreted to DTEU's

bargaining unit; and GRESPA had made a proper demand for recognition and bargaining. We deny the company's petition for review and grant in full the Board's applications for enforcement of its order.

I

The Grand Rapids Public Schools (GRPS) is a large, urban school district in Michigan serving more than 22,000 students in approximately 100 schools. In 1993, the Michigan Employment Relations Commission (MERC) certified the Grand Rapids Educational Support Personnel Association (GRESPA) as the exclusive collective bargaining representative of a district-wide unit of GRPS employees. The unit included most employees of GRPS' transportation department -- including all bus drivers, route planners, and mechanics, but not including five dispatchers and one payroll clerk. The transportation department was located at a single facility at 900 Union Street in the city of Grand Rapids. GRESPA also represented other non-teaching, non-clerical GRPS employees in the same unit. During the 2004-05 school year, GRPS employed more than 4000 people, of whom 536 were in the GRESPA bargaining unit. Approximately 168 of those employees worked at the Union Street facility.

The bus drivers in the GRESPA unit provided transportation for general and special education students. Those drivers transporting special education students, approximately 97 of the unit employees, were jointly employed by GRPS and the Kent Intermediate School District (KISD) pursuant to a July 2002 agreement between the two districts. KISD is a countywide school district that provides educational services to students with special needs.

In April 2005, the GRPS Board of Education approved a resolution to outsource all of its student transportation services to Dean Transportation, Inc., which employed drivers working out of seven different locations to provide transportation services for several school districts in the state. Thereafter, Dean signed a contract with GRPS for transportation of its students and a second contract with KISD for transportation of GRPS' special needs students. Under those contracts, Dean agreed to use its best efforts to maintain existing bus routes within GRPS for the first year and to offer incentives to current GRPS drivers to encourage them to apply for jobs with Dean. "The goal of the parties' agreement was for [Dean] to maintain continuity in the transportation services it provided to GRPS students." *Dean Transp., Inc.*, 350 N.L.R.B. No. 4, at 5 (June 21, 2007) (ALJ Op.). The contracts also required Dean to use GRPS' existing route planning software and to adhere to GRPS administration directives, and they gave the GRPS superintendent the right of final approval for any route changes. These provisions and others required Dean to treat its transportation services for GRPS differently from the services it provided to other school districts with respect to route planning, driving, maintenance, and employee compensation.

GRPS and KISD permanently laid off their transportation department employees on June 9, 2005, and Dean began transporting both general and special education students in Grand Rapids on June 10. As part of its arrangements with GRPS and KISD, Dean leased GRPS' Union Street facility and purchased the school buses that GRPS and KISD had used to transport students. The company continued to use the Union Street facility to provide transportation services for GRPS, including the maintenance and repair of buses, route planning, and dispatch operations. By the start of the school year in September, a majority of Dean's employees at Union Street had formerly been employed by GRPS in the same capacity,

including 100 of 137 drivers, 4 of 5 mechanics, and 2 of 3 route planners. All of these former employees had been represented by GRESPA when GRPS operated the Union Street facility. In addition, GRPS' Transportation Director continued in the same position for Dean, as did one of two GRPS supervisors. Dean also hired seven dispatchers to work at the Union Street facility: six had previously worked for GRPS as bus drivers and the seventh as a payroll clerk at the same facility.

Since 1976, Dean had recognized the Dean Transportation Employees Union (DTEU), which was certified by MERC, to represent the company's drivers. Beginning June 10, 2005, the company recognized DTEU as the exclusive collective bargaining agent of the bus drivers employed at Union Street, and DTEU accepted that recognition. Dean applied its existing bargaining agreement with DTEU to the Union Street drivers and deducted DTEU dues from their salaries. The company did not recognize any union with respect to the route planners, dispatchers, and mechanics.

On September 1, 2005, GRESPA sent Dean a letter stating that it was "the recognized exclusive collective bargaining representative of the employees performing transportation services for [GRPS] students that have been hired by Dean Transportation." J.A. 597. GRESPA asked the company to recognize and bargain with it as "the exclusive representative of the unit employees, including the full and part time bus drivers, dispatchers, mechanics, [and] route planners." *Id.* On September 15, the company refused to grant recognition, disputing GRESPA's claim to represent the employees.

In response, GRESPA filed unfair labor practice charges against Dean and DTEU with the National Labor Relations Board (NLRB), and, on December 28, the General Counsel issued a complaint. Thereafter, an Administrative Law Judge

(ALJ) found that: (1) Dean was a successor to GRPS as the employer of a unit of employees at the Union Street facility composed of bus drivers, mechanics, and route planners; (2) the unit was an appropriate bargaining unit; (3) the bus drivers in the unit were not accreted to the existing DTEU bargaining unit; and (4) GRESPA had made an appropriate demand for recognition and bargaining. In light of these findings, the ALJ concluded that Dean violated sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) & (1), by failing to recognize and refusing to bargain with GRESPA, and that it violated sections 8(a)(1), (2), and (3), 29 U.S.C. §§ 158(a)(1), (2), & (3), by recognizing DTEU as the representative of the bus drivers in the unit and imposing the terms of its collective bargaining agreement with DTEU. The ALJ also determined that DTEU violated sections 8(b)(1)(A) and (2), 29 U.S.C. §§ 158(b)(1)(A) & (2), by accepting that recognition and applying the terms of its collective bargaining agreement. *Dean*, 305 N.L.R.B. No. 4, at 13-14 (ALJ Op.). The Board affirmed the ALJ's findings and reasoning and adopted the ALJ's recommended order.

Dean now petitions for review, and the Board cross-petitions for enforcement. In Part II we consider the Board's finding that Dean was a successor employer, and in Part III we consider Dean's claim that the employees at the Union Street facility do not constitute an appropriate bargaining unit. In Part IV we address the accretion issue, and in Part V we consider Dean's contention that GRESPA's demand for recognition was inappropriate and hence ineffective.

We assess the NLRB's decision under familiar standards: "We review the Board's factual conclusions for substantial evidence, defer to NLRB rules if they are rational and consistent with the Act, and uphold the Board's application of law to facts unless arbitrary or otherwise erroneous." *Harter Tomato Prods.*

*Co. v. NLRB*, 133 F.3d 934, 937 (D.C. Cir. 1998) (quotation marks and citations omitted).

II

A "new employer has an obligation to bargain with" the union representing its predecessor's employees if, inter alia, "the new employer is in fact a successor of the old employer and the majority of its employees were employed by its predecessor." *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 41 (1987); *see Harter Tomato*, 133 F.3d at 937. It is undisputed that a majority of Dean's employees at Union Street were formerly employed by GRPS in the same capacity, including 100 of 137 drivers, 4 of 5 mechanics, and 2 of 3 route planners. All of these former employees were represented by GRESPA when GRPS operated the Union Street facility. Dean contends, however, that it is not in fact a successor employer.

A new employer qualifies as a successor to its predecessor if there is "substantial continuity" between the enterprises. *Fall River*, 482 U.S. at 43. The determination of substantial continuity "is based upon the totality of the circumstances of a given situation, [and] requires that the Board focus on whether the new company has 'acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations.'" *Id.* (quoting *Golden State Bottling Co., Inc. v. NLRB*, 414 U.S. 168, 184 (1973)); *see Pennsylvania Transformer Tech., Inc. v. NLRB*, 254 F.3d 217, 222 (D.C. Cir. 2001); *CitiSteel USA, Inc. v. NLRB*, 53 F.3d 350, 353 (D.C. Cir. 1995). In *Fall River*, the Supreme Court identified the following factors as relevant to the determination of substantial continuity:

> [W]hether the business of both employers is essentially the same; whether the employees of the new company

8

> are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.

*Fall River*, 482 U.S. at 43. These factors are assessed from "the employees' perspective," and the court asks "whether 'those employees who have been retained will understandably view their job situations as essentially unaltered.'" *Id.* (quoting *Golden State Bottling Co.*, 414 U.S. at 184); *see Harter Tomato*, 133 F.3d at 937.

There is no dispute that Dean acquired substantial transportation assets from GRPS -- namely, all of GRPS' buses and the Union Street physical facilities -- and that it continued, without interruption, GRPS' transportation operations. The ALJ found that, "when viewed from the perspective of the employees, there has been very little change in their working conditions." *Dean*, 350 N.L.R.B. No. 4, at 11 (ALJ Op.). As the ALJ explained:

> The bus drivers continue to report to the same location, drive the same buses, transport the same group of students to essentially the same schools. They report to the same supervisors . . . that they did when they worked for GRPS and KISD. . . . The route planners . . . continue to work in the same office, doing the same jobs, using the same computer software, and reporting to the same supervisor . . . . The mechanics, likewise, work in the same garage, with the same equipment and tools, repairing and maintaining the same buses.

*Id.* Substantial evidence supports all of these findings, and Dean does not seriously contest them. Instead, the company focuses

on several factors that it contends should count against a finding of substantial continuity.

First, Dean argues that it "implemented a number of significant changes" when it took over operations at Union Street, "including changes with respect to wages and benefits, supervision, work rules, policies, training programs," paperwork, and the method for assigning routes. Petitioner's Br. 26-27. The ALJ acknowledged these operational changes. *See Dean*, 350 N.L.R.B. No. 4, at 8 (ALJ Op.). But as we have noted before, "[p]ointing to differences in size, wages, benefits, training, customer base, [and] managerial philosophy, . . . among others, . . . is unresponsive to the question we face. We ask not whether [the petitioner's] view of the facts supports its version of what happened, but rather whether the Board's interpretation of the facts is reasonably defensible." *Pennsylvania Transformer*, 254 F.3d at 224 (quoting *Harter Tomato*, 133 F.3d at 938) (internal quotation marks omitted). "If so, the case is over, even if [the petitioner's] version might support a contrary result." *Harter Tomato*, 133 F.3d at 938.

We have several times upheld a successorship determination by the Board even when factors like those highlighted by Dean were present. *See, e.g.*, *Community Hosps. of Cent. Cal. v. NLRB*, 335 F.3d 1079, 1084 (D.C. Cir. 2003); *Pennsylvania Transformer*, 254 F.3d at 224-25; *Harter Tomato*, 133 F.3d at 938; *United Food & Commercial Workers Int'l Union, AFL-CIO, Local 152 v. NLRB*, 768 F.2d 1463, 1473-74 (D.C. Cir. 1985). In *Pennsylvania Transformer*, for example, we found substantial continuity notwithstanding "differences in size, facilities, work force, managerial philosophy, [and] customer base," in part because "the business of both employers [was] essentially the same" and employees continued to "use the same skills and expertise." *Pennsylvania Transformer*, 254 F.3d at 223, 224. We reached a similar conclusion in *Community*

*Hospitals*. Despite the successor's "new supervisory and management structure; changes in the duties, compensation, and benefits of the nurses at the hospital; [and] changes in the nurses' shift schedules and in the organization of support functions," we nonetheless ruled that the Board had "reasonably found that the nurses at [the hospital] continued to do the same jobs, in the same location, using the same equipment, and treating the same patients as they had before the acquisition." *Community Hosps.*, 335 F.3d at 1083.

Moreover, the Board's finding of substantial continuity here is directly in line with its decision in *Van Lear Equipment, Inc.*, 336 N.L.R.B. 1059 (2001). That case involved strikingly similar facts: a private employer engaged in school bus transportation took over the provision of services to a public school district but refused to recognize the union that had previously represented the district's bus drivers. *Id.* at 1059-60. The company maintained that substantial continuity was absent because it had implemented many operational changes. Although the Board recognized those changes, it rejected the company's argument because, "viewed from the drivers' perspective, the drivers are performing the same work that they performed as [school district] employees -- transporting school children to and from [district] schools by school bus and van." *Id.* at 1064. In light of *Van Lear*, Dean cannot seriously contend that the Board's interpretation of the facts in this case was not "reasonably defensible." *Pennsylvania Transformer*, 254 F.3d at 224 (internal quotation marks omitted).

Second, the company argues against a finding of substantial continuity on the ground that it only took over GRPS' Union Street facility and not the entire 536-employee GRESPA unit. But as the NLRB recognized, "[i]t is well established that the Board may find substantial continuity even where, as here, a successor employer has taken over only a discrete portion of the

predecessor's bargaining unit." *Dean*, 350 N.L.R.B. No. 4, at 1 n.2 (citing *Van Lear*, 336 N.L.R.B. at 1063-64; *Bronx Health Plan*, 326 N.L.R.B. 810 (1998), *enforced*, 203 F.3d 51 (D.C. Cir. 1999) (unpublished table decision)). Once again, *Van Lear* is directly on point. Although the bus drivers in that case had previously been represented in a larger unit that also included custodians, maintenance workers, and secretaries, the Board found substantial continuity "even though [the new employer] did not take over all the operations and functions of the prior [school district] bargaining unit." *Van Lear*, 336 N.L.R.B. at 1064.

Nor, as the Board correctly held, is *Atlantic Technical Services Corp.*, 202 N.L.R.B. 169 (1973), to the contrary. In *Atlantic Technical*, the Board found that a small company that took over the mail distribution function from aviation giant TWA was not TWA's successor. "[T]he new unit contained only 27 employees out of the TWA nationwide unit of 14,000, 1100 of whom were based at the same facility." *Dean*, 350 N.L.R.B. No. 4, at 1 n.2. As the Board noted in *Dean*, "[n]othing like those 'peculiar circumstances' exists here. The GRPS bargaining unit included 536 workers, 168 of whom worked at the 900 Union Street facility," and "[a] large majority of those 168 employees continued working at the facility after the change in management." *Id.* (quoting *Atlantic Technical*, 202 N.L.R.B. at 170). Although Dean charges that the Board unfairly limited the reach of *Atlantic Technical* by characterizing it as involving "peculiar circumstances," Petitioner's Reply Br. 3-4, that characterization comes from the *Atlantic Technical* opinion's own description of a small company taking over a small part of a giant entity, *see Atlantic Technical*, 202 N.L.R.B. at 170.

Finally, before the agency Dean argued against a finding of substantial continuity on the ground that the Union Street

workers, who at GRPS had been public-sector employees governed by Michigan law, were now private-sector employees subject to a different statutory scheme. In response, the ALJ correctly noted that "[t]he Board has applied [the usual successorship test] even where, as here, the predecessor is a public entity." *Dean*, 350 N.L.R.B. No. 4, at 11 (ALJ Op.) (citing *Community Hosps. of Cent. Cal.*, 335 N.L.R.B. 1318 (2001), *enforced*, 335 F.3d 1079 (D.C. Cir. 2003); *Lincoln Park Zoological Soc'y*, 322 N.L.R.B. 263 (1996), *enforced*, 116 F.3d 216 (7th Cir. 1997); *JMM Operational Servs.*, 316 N.L.R.B. 6 (1995)). Indeed, in *Van Lear*, the Board held that "the successorship doctrine continue[d] to apply even though the predecessor [school district]. . . [wa]s a public employer" and the successor bus transportation company was not. *Van Lear*, 336 N.L.R.B. at 1064. And in *Community Hospitals*, this court likewise ruled that "[t]he change from public to private ownership of the hospital does not undermine the Board's finding that Community was a successor." *Community Hosps.*, 335 F.3d at 1084.

On appeal, Dean focuses not simply on the general differences between public and private employment, but on the fact that the employees "will now have the right to 'strike'" under the NLRA, a right that was unavailable to them as public employees under Michigan law. Petitioner's Br. 27. Dean suggests that employees who acquire the right to strike under the NLRA may not want to be represented by the same union that represented them under a state statute that barred strikes. In response, NLRB counsel argues the opposite, contending that "the acquisition of the right to strike is more likely than not to support former public employees' desire" for continued representation. Respondent's Br. 41.

We do not resolve this dispute. Dean did not mention this right-to-strike argument in any of its filings before the Board

and offers no excuse for not doing so.[1] Section 10(e) of the NLRA therefore prevents us from considering it. 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."). Given that none of the Board precedents discussing the impact of a public-to-private change on the issue of successorship addresses the right-to-strike point, there was no reason for the Board to suspect that this was the objection Dean was raising. Dean's general reference to the different statutory schemes was therefore insufficient to put the Board on "'adequate notice' of the argument [the company now] seeks to advance on review," and we are barred from considering it. *Highlands Hosp. Corp., Inc. v. NLRB*, 508 F.3d 28, 33 (D.C. Cir. 2007) (quoting *American Postal Workers Union v. NLRB*, 370 F.3d 25, 28 (D.C. Cir. 2004)); *cf. id.* (holding that a petitioner's "generalized" "reference to the 'excessive breadth' of a remedy with multiple parts" was insufficient to put the Board on notice that the petitioner was challenging the adequacy of the justification for an affirmative bargaining order).

## III

Dean also maintains that the unit of drivers, route planners, and mechanics at the Union Street facility does not constitute an appropriate bargaining unit. Our standard of review when considering such a claim is, again, quite limited. The Board "need only select *an* appropriate unit, not *the most* appropriate

---

[1] Dean observes in a footnote that the Mackinac Center for Public Policy had attempted to file an amicus brief with the NLRB that would have raised the right-to-strike issue. Petitioner's Reply Br. 8 n.5. But the Board denied the Mackinac Center leave to file, and Dean never raised the issue in its own pleadings.

unit." *Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 236 (D.C. Cir. 1996) (quoting *Cleveland Constr., Inc. v. NLRB*, 44 F.3d 1010, 1013 (D.C. Cir. 1995) (internal quotation mark omitted)).

Dean's principal contention is that the Board erred in finding appropriate a unit consisting of employees at a single facility. But as the ALJ stated, "[t]he Board has long recognized a presumption that a single plant or store unit is appropriate for purposes of collective bargaining unless it has been so effectively merged into a comprehensive unit, or is so functionally integrated, that it has lost its separate identity." *Dean*, 350 N.L.R.B. No. 4, at 11 (ALJ Op.); *see Community Hosps.*, 335 F.3d at 1084; *Van Lear*, 336 N.L.R.B. at 1063. Dean argues that a single-location unit is not appropriate in this case because the company has merged the bus drivers at Union Street into its company-wide operations, and the Union Street drivers therefore no longer retain a separate identity. To support this argument, Dean notes that: its regional and corporate managers supervise all Dean employees; the company has adopted firm-wide training and personnel policies; the Union Street facility is located only eight miles from another Dean facility; and occasional interchange has occurred between employees at Union Street and those at other facilities.

Although the ALJ acknowledged that Dean is "a highly centralized operation," he concluded that the factors noted by Dean did not undermine the single-site presumption because: onsite supervisors oversee day-to-day operations at the Union Street location; as a result of the contracts that Dean signed with GRPS and KISD, Union Street drivers are treated separately from drivers at Dean's other facilities for job assignment and bidding purposes; the degree of interchange between Union Street and other facilities is minimal; and Union Street is the only depot that employs a substantial number of general

education drivers in addition to special education drivers. *Dean*, 350 N.L.R.B. No. 4, at 12 (ALJ Op.). Substantial evidence in the record supports all of these findings, and *Van Lear* again supports the ALJ's conclusion. There, the Board found appropriate a single-site unit composed of the predecessor's bus drivers, notwithstanding that the successor was "centrally managed" from its home office, because the on-site supervisor "maintain[ed] discretion and independence on certain matters" and because there was no interchange between the drivers at the different locations. *Van Lear*, 336 N.L.R.B. at 1063.

Dean presses upon us *Dattco, Inc.*, 338 N.L.R.B. 49 (2002), a case in which the NLRB found that the respondent had rebutted the single-site presumption. We agree with the Board, however, that *Dattco* "is easily distinguishable on its facts because the operation of the facility in *Dattco* was completely integrated with a network of other facilities." *Dean*, 350 N.L.R.B. No. 4, at 1 n.3. As the Board noted:

> Fully one-third of the bus drivers in *Dattco* were shuttled from their home facilities to other terminals on a daily basis . . . . Upon arriving at the new facility, drivers were supervised by managers based at that other facility. Here, the drivers work exclusively out of their home facility, where their routes and runs are determined, and where they are supervised by the local managers. This autonomy of the 900 Union Street facility over day-to-day operations . . . distinguishes it from the facility in *Dattco*.

*Id.* At oral argument, Dean acknowledged that the facts of *Dattco* do distinguish it from the instant case. Oral Arg. Recording at 14:28-38.[2]

In concluding that a single-site unit was appropriate, the ALJ also properly gave weight to the fact that the drivers, route planners, and mechanics at the Union Street facility "had a long history of being represented by GRESPA." *Dean*, 350 N.L.R.B. No. 4, at 11 (ALJ Op.); *see Community Hosps.*, 335 F.3d at 1085 ("[A] group of employees with a significant history of representation by a particular union presumptively constitute[s] an appropriate bargaining unit."); *see also Trident Seafoods, Inc. v. NLRB*, 101 F.3d 111, 118 (D.C. Cir. 1996). Dean objects that the Union Street employees were never a "historical bargaining unit," but instead were merely part of the larger 536-person GRESPA unit. As the ALJ correctly observed, however, "[t]he fact that the employees [who Dean] hired to work at 900 Union Street were only a subset of a much larger bargaining unit is not determinative of the appropriateness of the unit." *Dean*, 350 N.L.R.B. No. 4, at 11 (ALJ Op.) (citing *Community Hosps.*, 335 F.3d at 1085). Indeed, we rejected an argument identical to Dean's in *Community Hospitals* because it "would have us distinguish between a previously recognized bargaining unit and a subset of such a bargaining unit, limiting the presumption of

---

[2] The other cases Dean cites as examples of inconsistent precedent are also readily distinguished. *See, e.g.*, *Prince Telecom*, 347 N.L.R.B. No. 73, at 5-6 (2006) (finding the single-site presumption rebutted, in part because dozens of employees had participated in temporary interchanges and because work assignments were organized by system rather than by facility); *Jerry's Chevrolet, Cadillac, Inc.*, 344 N.L.R.B. 689, 690-91 (2005) (finding the presumption rebutted because four facilities were located within a few feet of each other and shared a common employee parking lot, among other similarities).

appropriateness to the former." *Community Hosps.*, 335 F.3d at 1085. The petitioner in that case, we said, "provide[d] no authority for this distinction," which "is inconsistent with our [own] precedent." *Id.* (citing *Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO-CLC v. NLRB*, 604 F.2d 689, 695 (D.C. Cir. 1979)). Dean has been no more successful in finding relevant support.[3] And while Dean also insists that the "bargaining history" upon which the Board should have focused was that between Dean and DTEU, the case law instead concentrates on the history between the *employees* and their union. *See, e.g.*, *Community Hosps.*, 335 F.3d at 1085; *Trident Seafoods*, 101 F.3d at 118.

Dean further maintains that the Board should have applied the systemwide presumption it uses in the public utility industry, rather than the single-site presumption it employs generally and applied here. The Board applies the systemwide presumption to public utilities because they are "characterized by a high degree of interdependence of [their] various segments" and "the public has an immediate and direct interest in the uninterrupted maintenance of the essential services that this industry alone can adequately provide." *Baltimore Gas & Elec. Co.*, 206 N.L.R.B. 199, 201 (1973). For those reasons, the Board is "reluctant to fragmentize a utility's operations." *Id.*

---

[3] *Border Steel Rolling Mills, Inc.*, 204 N.L.R.B. 814 (1973), did not hold, as Dean asserts, that "the Board should not apply the single-site presumption, unless [a] unit was previously 'intact' as a single site unit." Petitioner's Br. 36 (emphasis omitted). Rather, in that case the Board found there was "an insufficient community of interest" among the employees of the previous employer's bargaining unit "to warrant a separate bargaining unit for those employees" because they had become "an integrated part of [the new employer's] overall operation." *Border Steel*, 204 N.L.R.B. at 822 (ALJ Op.). As discussed in the text, that was not the case for the Union Street employees.

GRPS is not a public utility, of course, and only one Board decision has extended the systemwide presumption beyond that industry. That case is easily distinguished. In *Alyeska Pipeline Service Co.*, 348 N.L.R.B. 808 (2006), the Board applied a systemwide presumption to a company that, although not itself a public utility, used a pipeline to transport 98% of the crude oil in Alaska. *Id.* at 809-11. The company, "which ha[d] an integrated and interdependent operation, [was] the sole source of supply for public utilities that render[ed] essential services to the public." *Id.* at 810. Dean's business does not enjoy a similar monopoly of school bus transportation in Michigan. Nor has the NLRB applied a systemwide presumption in its cases involving private bus transportation for public school districts. *See Dattco*, 338 N.L.R.B. at 50; *Van Lear*, 336 N.L.R.B. at 1063. There was nothing arbitrary in the Board's decision to follow those on-point precedents.

Dean contends that "a single facility unit at 900 Union Street as opposed to a multi-facility unit increases the likelihood of labor disputes and work stoppages, as Dean will now have to bargain" with two different unions. Petitioner's Br. 35. We acknowledge that recognizing a single-site union where another union otherwise has company-wide recognition may complicate bargaining for Dean. And Dean is correct in suggesting that an important policy behind both the NLRA in general and the Board's successorship doctrine in particular is the maintenance of industrial peace. *See Fall River*, 482 U.S. at 38; *Brooks v. NLRB*, 348 U.S. 96, 103 (1954); *Harter Tomato*, 133 F.3d at 937. But both the Supreme Court's and the NLRB's cases reflect the view that, in a successorship situation, industrial peace is best maintained by honoring the employees' original choice of bargaining representative. As the Court said in *Fall River*:

> If the employees find themselves in a new enterprise that substantially resembles the old, but without their chosen bargaining representative, they may well feel that their choice of a union is subject to the vagaries of an enterprise's transformation. This feeling is not conducive to industrial peace.

*Fall River*, 482 U.S. at 39-40; *see Community Hosps.*, 335 N.L.R.B. at 1334 (ALJ Op.). This is a policy judgment that we are without authority to supersede. *See NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786-87 (1990).

At oral argument, we asked Dean's counsel whether there was any case in which the Board (or a court) had found the successorship factors satisfied but nonetheless declined to make a finding of successorship because another union was representing similar employees company wide. Counsel could not point to any, but did direct us to *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272 (1972), as a case that emphasized the concern for maintaining industrial peace. In *Burns*, however, the Supreme Court required Burns International, which replaced another company that had provided protection services at a particular site, to recognize the union that had represented its predecessor's employees at that site -- notwithstanding that a different union represented Burns' workers at its other locations. *Burns*, 406 U.S. at 275-76, 279-80. Hence, if *Burns* is indeed the "granddaddy of all successor cases," as Dean characterized it at oral argument, Oral Arg. Recording at 33:53-57, then its legacy points to the result reached by the Board in this case.[4]

---

[4] Dean also argues that the route planners and mechanics working at Union Street do not share a community of interest with the facility's bus drivers and hence do not belong in the same bargaining unit. The ALJ, supported by substantial evidence, found to the contrary: "[T]he

IV

The NLRB also rejected Dean's contention that the bus drivers at the Union Street facility constitute an accretion to the DTEU unit. Accretion is the addition of a group of employees to an existing union-represented bargaining unit without a Board election. As the ALJ noted, "[b]ecause accretion essentially deprives employees of their statutory right to choose their bargaining representative, the Board has historically followed a restrictive policy in applying the accretion doctrine." *Dean*, 350 N.L.R.B. No. 4, at 12 (ALJ Op.) (citing *Frontier Tel. of Rochester, Inc.*, 344 N.L.R.B. 1270 (2005)); *see New York Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076-77 (D.C. Cir. 2007). "One aspect of this long-standing restrictive policy . . . has been to permit accretion 'only when the employees sought to be added to an existing bargaining unit have little or no separate identity and share an overwhelming community of interest with the preexisting unit to which they are accreted.'" *Frontier Tel.*, 344 N.L.R.B. at 1271 (quoting *E.I. Du*

---

drivers at 900 Union Street have more of a community of interest with the route planners and mechanics at that facility than with the bus drivers at Dean's other facilities by virtue of their shared bargaining history. . . . In addition, they have much more frequent interaction with these employees and share day-to-day supervision with them." *Dean*, 350 N.L.R.B. No. 4, at 12 (ALJ Op.). The Board has previously approved units that combine drivers with other transportation employees, *see, e.g.*, *Marks Oxygen Co. of Ala.*, 147 N.L.R.B. 228, 229 (1964), and, as we have noted, "the Board need only select *an* appropriate unit, not *the most* appropriate unit," *Serramonte Oldsmobile*, 86 F.3d at 236 (quoting *Cleveland Constr.*, 44 F.3d at 1013 (alteration omitted) (internal quotation mark omitted)). Dean's contention that a drivers-only unit would be preferable ignores our standard of review.

*Pont de Nemours, Inc.*, 341 N.L.R.B. 607, 608 (2004)); *see Dean*, 350 N.L.R.B. No. 4, at 12 (ALJ Op.).

The factors that the Board considers in determining whether a group of employees has accreted to an existing unit, many of which are the same as those it considers in making appropriate unit determinations in initial representation cases, include: "integration of operations, centralized control of management and labor relations, geographic proximity, similarity of terms and conditions of employment, similarity of skills and functions, physical contact among employees, collective bargaining history, degree of separate daily supervision, and degree of employee interchange." *Frontier Tel.*, 344 N.L.R.B. at 1271. The "'two most important factors' -- indeed, the two factors that have been identified as 'critical' to an accretion finding -- are employee interchange and common day-to-day supervision." *Id.* (quoting *E.I. Du Pont*, 341 N.L.R.B. at 608); *see Super Valu Stores, Inc.*, 283 N.L.R.B. 134, 136 (1987) (holding that accretion had not occurred, notwithstanding that there was "integration of operations, similarity of employee skills, functions, and working conditions, and . . . contact between [employees at separate locations]," because there was neither employee interchange nor common supervision).

The ALJ rejected Dean's accretion argument because he found both of the critical factors to be absent: "The overwhelming evidence in this record establishes that the drivers at 900 Union Street do not share common day-to-day supervision with [Dean's] drivers at its other facilities," and "there is very little evidence of the kind of employee interchange that would support a finding of accretion." *Dean*, 350 N.L.R.B. No. 4, at 12 (ALJ Op.). These findings are supported by substantial evidence and are therefore entitled to our deference.

V

Finally, we address Dean's contention that its refusal to recognize or bargain with GRESPA was justified because the union made an inappropriate demand. GRESPA's September 1 demand letter advised Dean that GRESPA was "the recognized exclusive collective bargaining representative of the employees performing transportation services for [GRPS] students that have been hired by Dean Transportation." J.A. 597. It therefore asked Dean to recognize it as the exclusive representative of the unit employees, including "bus drivers, dispatchers, mechanics, [and] route planners" at Union Street. *Id.* GRESPA did not represent the dispatchers when GRPS operated the facility -- although it did represent a category called "dispatchers/route planners" -- and the dispatchers were not included in the unit alleged in the General Counsel's complaint to be appropriate. Dean contends that this disparity, between GRESPA's demand letter on the one hand and the unit it historically represented (and that was alleged in the complaint) on the other, rendered GRESPA's demand ineffective because it did not "'clearly define the unit for which recognition is sought.'" *Motown Record Corp.*, 197 N.L.R.B. 1255, 1261 (1972) (quoting *The C.L. Bailey Grocery Co.*, 100 N.L.R.B. 576, 579 (1952)).

The ALJ's response is persuasive. As he explained, the union's

> demand, when read in its entirety, is sufficient to convey to [Dean] GRESPA's desire to negotiate on behalf of an appropriate unit of employees. The first sentence in the letter explicitly states that GRESPA was seeking recognition as the bargaining representative of those 'employees performing transportation services for [GRPS] students that have been hired by [Dean]' . . . . The use of the term 'dispatchers' in the second

> sentence, although confusing, was consistent with the bargaining history between GRESPA and GRPS where route planners had been classified as 'dispatchers/route planners' and had performed dispatch functions as needed.  If [Dean] had any doubt about GRESPA's demand, it certainly could have sought clarification.

*Dean*, 350 N.L.R.B. No. 4, at 13 (ALJ Op.) (second alteration in original).  Moreover, as the Board noted in affirming the ALJ, it had "rejected an identical argument" in *Hydrolines, Inc.*, 305 N.L.R.B. 416 (1991):

> As the Board there explained, when a union demands recognition based on a card majority in an initial organizing context, the union is aware of which employees it has been attempting to organize, and thus may be expected to present the employer with an accurate description of the unit it seeks to represent. . . . [H]owever, we do not expect perfect precision from a union bargaining demand in a successorship situation (such as this one), as the union may be unaware or uncertain of a successor's plans for its hiring and operations.

*Dean*, 350 N.L.R.B. No. 4, at 2 n.5.  Because GRESPA's unit description "merely . . . deviated slightly from that in the complaint," the Board concluded that the union's demand for recognition was effective.  *Id.*  That conclusion was neither arbitrary nor capricious.

24

VI

For the foregoing reasons, we deny Dean's petition for review and grant the Board's applications for enforcement of its order.

*So ordered.*